# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-02654-SCT

*HOBBS AUTOMOTIVE, INC., d/b/a KIM'S*
*CHRYSLER, DODGE, JEEP, TOYOTA*

*v.*

*SHELIA S. DORSEY AND JAMES DORSEY*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 12/02/2003 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MARCUS DOUGLAS EVANS |
| | ROBERT D. GHOLSON |
| | THOMAS T. BUCHANAN |
| ATTORNEY FOR APPELLEES: | LAWRENCE E. ABERNATHY, III |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 09/15/2005 |
| MOTION FOR REHEARING FILED: | 02/22/2005 |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing filed by James and Sheila Dorsey is granted. The prior opinion is withdrawn, and these opinions are substituted therefor.

## FACTS AND PROCEEDINGS BELOW

¶2.     James and Shelia S. Dorsey [hereinafter Dorseys] purchased a vehicle from Hobbs Automotive, Inc., d/b/a Kim's Chrysler, Dodge, Jeep, Toyota [hereinafter Dealership]. Thereafter, a dispute arose regarding the sale of the vehicle and its financing which resulted

in the Dealership filing a complaint for replevin against the Dorseys in the County Court of Jones County.  In response, the Dorseys filed an answer and a counterclaim, alleging fraudulent misrepresentation, breach of contract, and fraudulent inducement.  The Dorseys' counterclaim sought compensatory damages in an amount not to exceed $100,000 and punitive damages of an unspecified amount.  The Dealership moved to dismiss its complaint, which the court granted.  A jury trial was conducted on August 16-17, 2001, regarding  the Dorseys' counterclaim, and the jury returned a verdict in favor of the Dorseys in the amount of $100,000.  Judgment was entered accordingly.

¶3.     The Dealership appealed to the  Jones County Circuit Court, which affirmed the judgment.  The Dealership appealed to this Court.

¶4.     We conclude that jurisdiction was proper in the county court.  We also find that a sale of the vehicle in question occurred as determined by the trial judge.  Finally, we hold that the trial court correctly reformed the verdict.  We therefore affirm the judgment of the lower court.

## DISCUSSION

### I.     WAS JURISDICTION PROPER IN THE COUNTY COURT?

¶5.     At the time, § 9-9-21 of the Mississippi Code Annotated stated that counter claims could not exceed $75,000; moreover, if this amount was exceeded, then upon the parties' notice, the county court was required to transfer the case to either circuit or chancery court which would then exercise jurisdiction over the matter.  Rule 13(h) of the Miss. R. Civ. Pro. is controlling instead of the *Horton* case, which was decided prior to the 1974 amendment to

2

§ 9-9-21 of the Mississippi Code Annotated and prior to the Mississippi Rules of Civil Procedure. *Horton v. White*, 254 So. 2d 188, 189 (Miss. 1971). *Horton*, holds "that the counterclaim, just as is required of the declaration, must comply with the same jurisdictional prerequisites and if those jurisdictional requisites are not met then the counterclaim cannot be adjudicated in the county court." *Id*. at 191-92.

¶6. Furthermore, the 1974 amendment to the aforementioned statute specifically allowed counterclaims that exceeded the original jurisdictional authority of the county courts. Stated another way, this amendment kept lawsuits in county court even if the setoff, counterclaims, or cross-claims requested an amount exceeding the jurisdictional limits of the county courts. According to the 1974 amendment, if the case was to be transferred to the circuit court it must be done upon motion of all parties. Moreover, absent a joinder of all parties to the motion, the case should remain in county court.

## II. DID THE CIRCUIT ERR BY AFFIRMING THE COUNTY COURT'S EXCLUSION OF TESTIMONY REGARDING "SPOT DELIVERY"?

¶7. The Dealership contends the Dorsey transaction was a spot-delivery and the conditional language in the purchase order was a condition precedent to its obligation to sell the car. The Dealership further contends that by excluding testimony regarding the conditional nature of the contract, the trial court prevented it from presenting its primary defense.

¶8. The trial judge's refusal to allow the Dealership to question witnesses and characterize the transaction as "conditional" must be viewed through the filter of Rule 401.

¶9. M.R.E. 401 defines relevant evidence as follows:

3

"Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

¶10. The threshold for admissibility of relevant evidence is not great. *Whitten v. Cox*, 799 So. 2d 1, 15 (Miss. 2000). Evidence is relevant if it has any tendency to prove a consequential fact. *Id*. If it has probative value, the law favors its admission. *Holladay v. Holladay*, 776 So. 2d 662, 676 (Miss. 2000). However, determining the relevancy and admissibility of evidence is within the discretion of the trial judge. *Abrams v. Marlin Firearms Co.*, 838 So.2d 975, 979 (Miss. 2003).

¶11. The Dorseys objected to any further testimony supporting the argument that the transaction was a spot-delivery and thus conditional. Further, the Dorseys argued that the retail installment contract did not contain any conditional language and that it did not refer to the purchase order. The objection was based not only on the Retail Contract (which was not conditional), but also on the fact the Dealership had actually transferred title to the Dorseys. Furthermore, the Dealership admitted through the testimony of one of its managers, Wayne Cumbest, that in a typical spot-delivery transaction the buyer does not receive title. That is to say, the transaction is not a spot-delivery if the buyer receives title.

¶12. We are persuaded that the trial judge's ruling was not error. We have carefully reviewed the purchase order relied upon by the Dealership, and we do not find the language to be a condition precedent. The language relied upon by the Dealership states:

**DEALER SHALL NOT BE OBLIGATED TO SELL UNTIL APPROVAL OF THE TERMS HEROF(sic) IS GIVEN BY A BANK OR FINANCE COMPANY WILLING TO PURCHASE A RETAIL INSTALLMENT**

**CONTRACT BETWEEN THE PARTIES HERETO BASED ON SUCH TERMS**.

¶13. This provision merely provides that the Dealership is not obligated to sell until the approval of the terms is given by a bank or finance company. Further, the Dealership's obligation to sell suspends until the requirements of the provision are met. However, not being under an obligation to sell the automobile did not prevent the Dealership from selling to the Dorseys. Therefore, the question then becomes whether the Dealership chose to do that which it was not obligated to do.

¶14. The trial court found, as a matter of law, that the transaction with the Dorseys was a sale.

Based upon the considerable evidence supporting a sale on March 7, 2000, and the dearth of any evidence to the contrary, this Court is unable to find that the trial court was in error.

### III. WAS THE COUNTY COURT CORRECT IN REFORMING THE FORM OF THE JURY VERDICT?

¶15. After deliberating for almost two hours, the jury in the case at bar returned a verdict in an unusual form. The jury determined that the Dorseys were entitled to "$100,000 for fraud." The trial court recognized that the jury's verdict was "a kind of special verdict", nevertheless the trial court also commented that "it is clear what they mean." Subsequently, the trial court reformed the unusual verdict and on August 29, 2001 the court entered a final judgement for the plaintiffs in the amount of $100,000.

¶16. Admittedly, the better procedure would have been for the trial judge to review the form of the verdict in the presence of the lawyers and note that it did not conform to the specific

instruction given as to form of the verdict and then, direct that the jury should return to the jury room, tell the jury that they had already been properly instructed regarding the form of the verdict, read carefully the proper form of the verdict which had been submitted to them in the existing jury instructions and for them to write their verdict following the exact language of that instruction. This procedure was not followed by the trial judge. The trial judge reformed the verdict to reflect the intent of the jury. The question for us now becomes, can we ascertain the unquestionable intent of the jury from the verdict which they rendered? The form of the jury verdict in the case at bar is sufficient for us to easily determine the intent of the jury. We note that the jury declined in writing to award emotional damages or reimbursement for medical payments. The jury also twice declined to award punitive damages. We find that the jury's intent is unambiguous; it awarded Dorsey $100,000 as compensation for fraud. Further, the record clearly shows that the allegations of fraud were pled and proved at trial and damages were properly awarded to the Dorseys. Accordingly, this Court affirms the verdict of the jury and the decision of the trial judge to reform the verdict.

¶17. This Court has consistently upheld jury verdicts absent any clear indication that the findings are clearly erroneous. Moreover, it has been previously decreed that:

> if there is substantial evidence supporting the verdict, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the jury verdict and the judgment entered thereon must be allowed to stand, and we, accordingly, have no authority to interfere.

*Condere Corp. v. Moon*, 880 So. 2d 1038, 1042 (Miss. 2004). Furthermore, this Court has also added that "[a] court in Mississippi can disturb a jury verdict if the court finds that the damages are excessive or inadequate for the reason that the jury was influenced by bias, prejudice, or passion, so as to shock the conscience." *Junior Food Stores, Inc. v. Rice*, 671 So. 2d 67, 76 (Miss. 1996), citing *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1190 (Miss. 1996). There is substantial and relevant evidence that was presented by the Dorseys in this matter; therefore, the jury's verdict shall not be overturned.

¶18. The record clearly shows that the actions of the Dealership were knowingly fraudulent, for there is a multitude of evidence to support the jury's award for fraud. This Court has enumerated the elements of fraud:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992)*.*

¶19. In this case, the Dorseys met the elements of fraud and proved the following:

> (1) The Dealership made written and oral representations to them regarding the purchase of the vehicle. These representations included the statements made by The Dealership's salesman, Billy Gray, in telling Mrs. Dorsey that the "vehicle is yours." The Dealership also represented to the Dorseys in writing that it would pay the balance due to General Electric Credit Corporation on Mrs. Dorsey's Mustang;
>
> (2) The Dealership tried to force the Dorseys to return the vehicle to them, and did not pay off the Dorsey's mustang, the traded in vehicle, financed by General

Electric Credit Corporation, who was repeatedly calling and inquiring of the Dorseys about their nonpayments;

(3) These representations by the dealership were material in that, without these representations, the Dorseys would have never signed the Retail Installment Contract, made a $2,000 down-payment, purchased insurance and delivered Mrs. Dorsey's Mustang to the dealership;

(4) The Dealership knew that these representations were false because before the Dorseys actually signed the Retail Installment Contract, the dealership had already received notification from Arcadia that it would not agree to finance the Dorseys' loan;

(5) The Dealership intended that the Dorseys act upon these representations and assisted the Dorseys in their actions by allowing them to take the vehicle at issue to their credit union to withdraw the funds for the down-payment. Additionally, the Dealership also assisted the Dorseys in their actions by making arrangements for the Dorseys to purchase insurance for the automobile;

(6) The Dorseys had no way of knowing that their credit application had already been denied when the executed their Retail Installment Contract;

(7) The Dorseys' reliance on the representations was proven by the execution of the contract, the down-payment of cash, the purchase of insurance, as well as the purchase of a tag for the vehicle.

(8) The Dorseys proved that at trial they had a right to rely upon the fraudulent representations made by the dealership;

(9) The Dorseys proved that they sustained damages as a result of the actions of the Dealership. The damages included having their credit reputation damaged as a direct result of the Dealership's failure to pay off the loan to General Electric Credit Corporation, and the Dealership's abuse of process that occurred when it reported the vehicle stolen.

¶20.     This Court has consistently held, with regard to the degree of proof required to prove the amount of damages, that:

> [w]here the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, which the damages may not be determined by mere speculation or guess, it will be enough

if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

*Billups Petroleum Co. v. Hardin's Bakeries Corp.*, 217 Miss. 24, 37-38, 63 So. 2d 543, 548 (1953) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 250, 75 L.Ed. 544 (1931)). This Court also stated that:

> [i]t is undoubtedly true that the plaintiff in a case of this kind must prove its damages with a reasonable degree of certainty. But the plaintiff should not be deprived of its right to recover because of its inability to prove with absolute certainty the extent of the loss or the exact amount of money unjustly and illegally collected, and the law does not require such absolute accuracy of proof.

*Id.*

¶21.    This very issue has been addressed recently by four Justices of this Court in *Bailey v. Beard*, 813 So. 2d 682, 687 (Miss. 2002) (Justice Smith in a concurring and dissenting opinion joined by Justices Waller, Cobb, and Carlson), where they stated that:

> [a]ctual damages as contemplated in the final order are not the same as what the court referred to as "actual" damages at the conclusion of the hearing. It is clear from the record of the hearing that the $26,495 in "actual" damages was awarded for Beard's out-of-pocket expenses. At the hearing, Beard testified that her out-of-pocket expenses totaled $26,495. However, Beard was also awarded $50,000 on the emotional distress claim and $100,000 on the fraud claim. These are also properly termed "actual damages" as actual damages are synonymous with compensatory damages. Black's Law Dictionary 394 (7th ed.1999). Thus, the sum awarded in the circuit court's final order for "actual" damages does not merely represent Beard's out-of-pocket expenses, but rather properly includes all of her compensatory damages.

¶22. Here the jury clearly and concisely reported that the verdict of $100,000 was awarded to the Dorseys upon their determination that the Dealership had engaged in fraudulent conduct. The Dorseys presented evidence at trial supporting the jury's verdict and all nine elements of fraud; therefore, the jury's verdict should remain undisturbed and the trial judge's decision to reform the verdict was proper under the facts of this case.

## CONCLUSION

¶23. For the abovementioned reasons, the judgments of the County Court of Jones County and Circuit Court of Jones County are hereby affirmed.

¶24. **AFFIRMED.**

**WALLER, P.J., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COBB, P.J. DIAZ, J., NOT PARTICIPATING.**

**DICKINSON, JUSTICE, DISSENTING:**

¶25.    Although I agree with much of the majority's conclusions, I sincerely regret that I cannot agree with its reasoning in part III.   My dissent from the majority's result pales in comparison to my level of disagreement and concern for today's approval and validation of what the majority calls "compensation for fraud."   As a result of this Court's decision today, "fraud" now wears two hats: it is a cause of action and now also an element of damages.   In my view, this case sets dangerous precedent, and I think it my duty to respectfully dissent.

## FACTS

¶26.    On March 7, 2000, Shelia Dorsey and her children went shopping for a used vehicle at Hobbs Automotive, Inc. d/b/a Kim's Chrysler, Dodge, Jeep, Toyota (the "Dealership").   Mrs. Dorsey informed the salesman, Billy Gray, that she needed a larger vehicle to take her sick husband to hospitals in Jackson and Birmingham, and that she wanted her monthly note to be close to her then current monthly payment of $415.   Gray showed Mrs. Dorsey a Mercury Mountaineer which she decided to purchase.

¶27.    Mrs. Dorsey completed a credit application and Gray went to have it processed.   When he returned he informed Mrs. Dorsey that if she would trade in her Mustang and make a $2,000 down payment, her monthly payment for the Mountaineer would be $448.   Gray stated he wanted Mrs. Dorsey to be certain the Mountaineer was the right vehicle for her, and he insisted

11

that she take it for a test drive. She did so, and concluded that she wanted to purchase the Mountaineer.

¶28. Mrs. Dorsey attempted to call her husband, who was in dialysis. She left him a message to join her at the dealership. She also called her father, Ernest Stewart, and asked that he meet her at the dealership. Stewart arrived first. He testified that Gray assured him Mrs. Dorsey had been approved for financing. Mr. Dorsey arrived at approximately 2:15 p.m., and Stewart left the dealership shortly thereafter.

¶29. Mr. Dorsey testified that he and Mrs. Dorsey accompanied Gray to Bob Hobbs's office[1] where Mr. Dorsey provided information related to his credit history and signed a credit application. The Dorseys were then told that the Dealership would obtain financing based on both of the Dorseys' credit, and that financing would be no problem. Hobbs told the Dorseys to go ahead and purchase insurance, and he recommended a nearby insurance agent. Gray called the agent and provided the VIN for the Mountaineer. He informed the agent that the Dorseys would be there soon to purchase the insurance. The Dorseys drove to the agent's office and purchased insurance to cover the Mountaineer. On their way back to the dealership, they stopped by an ATM and withdrew[2] the necessary cash for the $2,000 down payment.

---

[1] Bob Hobbs and his wife owned the dealership. Hobbs disputes whether Mr. Dorsey was present on March 7. His recollection was that Mr. Dorsey came by several days later. Hobbs also contends that a separate credit application was submitted which included Mr. Dorsey. However, several witnesses testified that Mr. Dorsey was present on March 7, 2000, and only Hobbs's testimony supports the claim that a credit application was submitted which included Mr. Dorsey.

[2] According to the withdrawal slip time stamp, the transaction took place at 2:57 p.m.

¶30.   About this time, the Dealership received a fax[3] from Arcadia Finance declining the credit application submitted on behalf of Mrs. Dorsey.   However, when the Dorseys returned to the dealership, they were not informed that Mrs. Dorsey's credit application had been rejected.   Instead, they were directed to complete the paperwork.

*Purchase order*

¶31.   The Dorseys were requested to sign a purchase order which provided in part:

Purchaser agrees that this Order includes all of the terms and conditions on both the face and reverse side hereof, that this Order cances (sic) and supersedes any prior agreement and as of the date hereof cocmprises (sic) the complete and exclusive statement of the terms of the agreement relating to the subject matters covered hereby.   THIS ORDER IS NOT BINDING UNTIL ACCEPTED BY DEALER AND IF A TIME SALE: (1) PURCHASER'S CREDIT HAS BEEN APPROVED BY A FINANCING INSTITUTION AND IT AGREES TO PURCHASE A RETAIL INSTALLMENT CONTRACT BASED ON THIS ORDER, (2) APPROPRIATE FINANCE CHARGE DISCLOSURES ARE MADE, AND (3) A SECURITY AGREEMNET (sic) EXECUTED.   UNTIL A TIME SALE ORDER BECOMES BINDING PURCHASER MAY CANCEL IT AND RECOVER ANY DEPOSIT MADE.   **DEALER SHALL NOT BE OBLIGATED TO SELL UNTIL APPROVAL OF THE TERMS HEROF(sic) IS GIVEN BY A BANK OR FINANCE COMPANY WILLING TO PURCHASE A RETAIL INSTALLMENT CONTRACT BETWEEN THE PARTIES HERETO BASED ON SUCH TERMS.**   Purchaser by his execution of this Order certifies that he is of legal age or older and acknowledges that he has read its terms and conditions and has received a true copy of this Order.

NOTICE: WHERE THE DEALER ARRANGES FINANCING, the dealer may receive a portion of the "finance charge" from the Lender.

---

[3]The fax was received at the Dealership at 3:02 p.m.

¶32. Mrs. Dorsey and a representative of The Dealership signed the purchase order. Mr. Dorsey did not.

*The retail installment contract*

¶33. The retail installment contract (the "Contract") was an agreement for The Dealership to sell, and the Dorseys to purchase, the Mountaineer. The Contract identified Mrs. Dorsey and Mr. Dorsey as "Buyer" (and "Co-Buyer") and Kim's Toyota as "CREDITOR" and "Seller," and contained no conditional language. The contract provided:

> You, the Buyer (and Co-Buyer, if any), may buy this vehicle described below for cash or on credit. The cash price is shown below as 'cash price.' The credit price is shown below as 'Total Sale Price.' By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract.

¶34. The contract identified the Mountaineer as the vehicle being sold to the Dorseys. It also provided the purchase price and the financing terms, including the trade-in of the Dorseys' Mustang and the amount of the Dorseys' monthly payment. Mr. Hobbs testified that some of its retail installment contracts were retained in-house, meaning the customer made the monthly payments directly to the Dealership. However, the Dealership sold most of its retail installment contracts to financial institutions, resulting in the Dealership getting its money up front, and the payments being made to the financial institution.

¶35. Both Mrs. Dorsey and Mr. Dorsey signed the Contract. The blank line for "Seller" was filled in with the typed name, "KIM'S C-P-D-J-TOYOTA."

14

¶36.    Upon completing the paperwork, the Dorseys made the $2,000 down payment to The Dealership, turned over the Mustang and left the dealership in the Mountaineer, satisfied that the transaction was complete.

*Application for certificate of title*

¶37.    On March 9th, while attempting to purchase a license plate for the Mountaineer, Mrs. Dorsey was informed by the tax collector's office that she lacked all the proper paperwork. She drove to the dealership for help.   According to Mrs. Dorsey, Mr. Hobbs – making no mention of any problem with the sale or financing of the vehicle – gave Mrs. Dorsey an application for certificate of title.   The application was dated March 7, and was signed by Mrs. Dorsey and Mr. Dorsey, who were identified as "OWNERS."   Above the Dorsey's signature was the recitation:

> I, THE UNDERSIGNED, CERTIFY THAT THE VEHICLE DESCRIBED ABOVE IS OWNED BY ME AND I HEREBY MAKE APPLICATION FOR A CERTIFICATE OF TITLE FOR SAID MOTOR VEHICLE, AND THIS VEHICLE WILL NOT BE SUBJECT OF LIEN PRIOR TO RECEIPT OF TITLE UNLESS INDICATED ABOVE.

¶38.    Below the Dorseys' signatures was the following recitation:

> I HEREBY CERTIFY THAT THE ABOVE DESCRIBED VEHICLE HAS
> BEEN PHYSICALLY INSPECTED BY ME AND THAT THE V.I.N.AND
> DESCRIPTIVE DATA SHOWN ON THIS APPLICATION ARE CORRECT
> AND FURTHER, IDENTIFIED THE PERSON SIGNING THE APPLICATION
> AND WITNESSED HIS SIGNATURE.

Just beneath this recitation was the signature of an authorized representative of Kim's Toyota.

¶39.   Mrs. Dorsey returned to the collector's office with the application for certificate of title, and was issued a tag.

*Dealership attempts to rescind*

¶40.   On March 31, Gray called Mrs. Dorsey at her place of employment.[4]  He informed her that the Dealership had been unable to secure financing based on the terms he quoted her.  He suggested that she return the Mountaineer so he could put her in a used Dodge Neon.  Mrs. Dorsey stated that she had the truck she wanted and reminded Gray that she needed a larger vehicle and that the Neon was smaller than her old Mustang.  Gray offered to return the Mustang.  Nothing was resolved during this conversation, but Mrs. Dorsey agreed to come by the dealership and on the following Monday,[5] accompanied by her father, she did so.

¶41.   During this meeting on April 3, Mrs. Dorsey was again offered her old car, which she declined.  Mr. and Mrs. Dorsey returned the following day, April 4, accompanied by attorney Jeannene Pacific.  Again, no resolution was reached and the Dorseys left the Dealership.

*Call to police*

¶42.   On that same day, the police received a report from the Dealership that the Mountaineer had been stolen.  Police officers investigated the report but concluded the matter was civil and took no further action.

---

[4]  She worked two jobs: Church's Fried Chicken during the day and the Ellisville State School during the night.

[5]  April 3, 2000.

¶43.    Mrs. Dorsey testified that as she left the Dealership on April 4, she overheard a dealership employee discuss calling the police.  Prior to the trial, the Dorseys took the deposition of Wayne Combost, a manager at The Dealership.  At his deposition, Combost offered sworn testimony that while he remembered the police coming to the Dealership, he did not remember calling the police or having any conversation with them.  Combost also testified in his deposition that he did not remember why the police came to the Dealership or what caused them to be there.

¶44.    At trial, counsel for the Dorseys confronted Combost with his deposition testimony and he again testified that he had no memory of calling the police.  Then, counsel for the Dorseys played a tape recording of the call to police.  Thereafter, Combost stated that the tape recording had refreshed his memory.  Combost admitted that the voice on the tape recording was his and that he had made the call to the police from the Dealership.  Combost testified that he called the police to report the Dorsey's vehicle as stolen and that he had done so at the direction of general sales manager, Mike Tanna.  Combost further testified that he had not recalled this event during his deposition.

¶45.    Unsuccessful at persuading the Dorseys to return the Mountaineer, and unable to persuade the police that the Mountaineer was stolen, the Dealership filed a complaint for replevin in the County Court of Jones County on April 10, 2000.  The Dorseys answered and filed a counterclaim alleging, *inter alia*,  fraudulent misrepresentation, breach of contract and

17

fraudulent inducement.[6]  The following day, the Dealership assigned the installment contract to a local bank and filed a motion to dismiss its complaint.  Shortly thereafter, the Dealership dismissed its complaint, but the Dorseys proceeded to trial on their counterclaim.

¶46.  At trial, the Dorseys testified they feared their Mountaineer would be repossessed, and that they had received numerous collection calls from General Electric Capital Corporation concerning their delinquent payments on the note covering their old Mustang.  Although the Retail Contract provided that the Dealership would pay off the Mustang, it failed to do so until after the Dorseys answered the lawsuit with a counterclaim against the dealership.

¶47.  The Dorseys testified that employees of the Dealership would drive by their home and by Church's.  Mrs. Dorsey alleged that her anxiety forced her to visit a doctor and quit her job at Church's Fried Chicken.

¶48.  The Dealership's defense relied heavily on the purchase order's conditional language which, according to the Dealership, rendered the transaction a spot-delivery (i.e. conditional sales contract).  The Dorseys disputed this and argued that the transaction was an unconditional retail installment contract, and that a sale had taken place.  The Dorseys argued that any disagreement as to whether the transaction was conditional was resolved in their favor when they obtained legal title to the vehicle.

_____

[6]  A third-party claim filed against General Electric Capital Auto Financial Services, Inc., is not at issue.

¶49. During the trial, the Dorseys objected to the Dealership's argument that the transaction was conditional. The trial judge initially overruled the objection, but the following day reconsidered the objection, sua sponte, and ruled that testimony regarding spot-delivery was irrelevant. The trial judge stated that, even though the purchase order was entered into evidence, the parties entered into a retail installment contract which had no conditions. Further, based on the testimony of several employees of the Dealership (including Hobbs), and on the fact that the Dealership signed over title to the Dorseys, any doubt concerning the conditional nature of the transaction must be resolved in favor of the Dorseys.

¶50. At the conclusion of testimony, counsel made their closing arguments. Counsel for the Dorseys told the jury, without objection, that the jury should put a stop to the kind of conduct engaged in by the Dealership to prevent other "Dorseys" out there from receiving similar treatment.

*The jury verdict*

¶51. The trial court correctly instructed the jury: "If you find for the plaintiff the form of your verdict may be: We the jury find for the plaintiff and assess damages at $_____. Write your verdict on a separate sheet of paper."

¶52. Although the use of the term "may" did not make compliance with the instruction mandatory, it reasonably complied with Rule 49. The only elements of damages authorized by

the jury by instruction were "mental and emotional distress" presented in instruction P-3 and "the cost of the prescription medicine" presented in instruction P-6.

¶53.    The jury was not authorized or instructed to return a special verdict.   Nevertheless, the jury returned a special hand-written verdict.  The first page of the verdict provided:

**$0 no compensation for _____**

**$0 no compensation for _____**

**$0 no compensation for _____**

**$0 no compensation for _____**

**$0 no compensation for <u>illness</u> instr. P-3**

**$0 no compensation for medication instr. P-6**

The second page of the verdict stated:

**$100,000**

**for fraud  ~~not illness, suffering~~**

**~~etc.~~    instr. P-8**

The unauthorized verdict form did not state that the jury found for the plaintiff.   However, it appears to indicate that the jury intended to award no damages under instruction P-3, which provided as follows:

> The Court instructs the jury that if you believe from a preponderance of the evidence in this case that the Dorseys suffered demonstrable worry, aggravation, irritation and mental and emotional distress which was reasonably foreseeable,

20

as the result of the actions of Kim's Toyota, then, in that event, you may find for the Plaintiffs and award them damages that you believe will fairly compensate them for the mental and emotional distress they sustained.

The jury's verdict form also appears to indicate that the jury intended to award no damages under instruction P-6, which provided as follows:

The Court instructs the jury that if you believe from a preponderance of the evidence in this case that Mrs. Dorsey became so worried and upset as a result of the actions of Kim's Toyota that she sought medical attention from her doctor, and was required to take prescription medicine for her nerves, then, in that event, you may award her damages in an amount that you believe will compensate her for the cost of the prescription medicine.

¶54. When the jury returned its unauthorized special verdict, the Dealership requested that the jury be polled. The poll confirmed the verdict and that it was unanimous. The trial court then ordered the verdict filed and entered of record and dismissed the jury until 9:30 a.m. the following Monday morning.

¶55. After the jury left the courtroom, the Dealership's counsel stated: "Your Honor, we would reserve our objections. I think we have some exceptions to take to the form of the jury's verdict in this case. I think we will reserve those, if it please the Court, until Monday." The trial judge replied, "Sure."

¶56. On the following Monday morning, counsel for the Dorseys stated to the court: "This morning I had an opportunity to look at the verdict, and I notice it is not in the form that the Court instructed the jury to render." Counsel then requested that the trial court reform the verdict.

21

¶57. Counsel for the Dealership then argued that, because the verdict form returned by the jury did not comply with the court's instructions,[7] the Dealership was entitled to judgment in its favor. Counsel for the Dealership provided the following argument:

> The only way that this verdict can be reconciled with the proof is that it is an attempt by the jury to say that the proof shows that the plaintiff suffered no damages, yet we do not agree with what Kim's did and we want to punish them and ensure that that conduct does not repeat itself in the future. We think that's the only way that that verdict can be reconciled with the proof.

¶58. Following the argument presented by the Dealership, the trial court stated, "The Court, on its own motion, pursuant to Rule 3.10 of the Uniform Circuit and County Court Rules, amends the form of the verdict to read, "we, the jury, find for the plaintiffs in the amount of $100,000." The jury was then instructed on punitive damages. Thereafter, the jury declined to award punitive damages. The verdict was affirmed by the Jones County Circuit Court and the Dealership filed its appeal to this Court.

## ANALYSIS

### I.    The Fraud Claim.

¶59. The crux of the Dorseys' fraud claim is that the transaction was a "bait-and-switch." They alleged that Gray and Hobbs made oral and written representations concerning the sale and financing of the Mountaineer, and that they relied upon those representations. As a result,

---

[7]In its brief, the Dealership characterizes the jury's verdict form as "hopelessly at odds with the instructions and in a form that does not remotely comply with the form of the verdict instruction."

the Dorseys contend they traded in their old car, made a down payment, insured, registered and purchased a tag for the car, and informed others that they owned the vehicle.

¶60.    The Dealership claims that the Dorseys failed to prove any damages and that *Monsanto Co. v. Cochran*, 180 So. 2d 624, 628 (Miss. 1965) requires that both fraud and damages must exist to constitute actionable fraud.    The Dealership also (and I assume alternatively) argues that the Dorseys failed to prove damages within a reasonable degree of certainty.    The Dealership collaterally argues that the Dorseys had a duty to read the contracts and that, because they failed to do so,  they may not rely on the alleged misrepresentations.

¶61.    In order to recover on a claim of fraudulent misrepresentation, the complaining party must prove, by clear and convincing evidence, the following elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992) (citations omitted).    There must be sufficient evidence to create an issue of fact for the jury as to each element.  *Id*. at 780-81 (citations omitted). "[T]he rule is well settled that 'fraudulent representations upon which a party may predicate any demand for relief must relate to past or presently existing facts, as facts, and cannot consist of promises, except in some cases when a contractual promise is made with the present undisclosed intention of not performing it.'"    *Skrmetta v. Bayview Yacht Club, Inc.*, 806 So. 2d 1120, 1125 (Miss. 2002)(citations omitted).

23

¶62.    In *First Money, Inc. v. Frisby*, 369 So.2d 746 (Miss. 1979), this Court stated:

> The basis for damages resulting from negligent misrepresentation is the lack of care; the basis for damages resulting from fraud is the want of honesty. See Restatement of the Law of Torts (Second) sections 549 and 552 (1977). The lack of care in negligent misrepresentation and the want of honesty in fraudulent misrepresentation in business transactions give rise to distinct causes of action, the one in tort, the other in fraud.

*Frisby*, 369 So. 2d at 750.

### *Fraudulent conduct*

¶63.    I agree with the majority that the record contains sufficient evidence to support both negligent and fraudulent misrepresentation.  Several times on March 7, 2000, the Dorseys and Mr. Stewart questioned whether they qualified for financing.  There was testimony that both Billy Gray and Bob Hobbs assured them not only that they were qualified for financing, but that they would be financed.

¶64.    Hobbs testified that the Dealership's policy was to keep documents generated from its efforts to obtain financing for customers.  However, he could not explain why the dealership did not have any documents showing that it indeed had attempted to obtain financing from various institutions. (Part of the Dorseys' claim is that the Dealership never submitted a financing application based on both the Dorseys.)  The only document presented by the Dealership which indicates it ever sought financing on behalf of the Dorseys was the facsimile from Arcadia Financial Limited, denying credit to *Shelia Dorsey*.  Even though the Dealership received this facsimile an hour or two prior to execution of the contracts and delivery of the

24

vehicle to the Dorseys, they were not informed of it. Instead, the Dealership assured them that financing was not a problem.

¶65. During his deposition, Hobbs testified that once Arcadia declined financing he knew the Dorseys would be unable to get financing. Hobbs did not explain, however, why he did not communicate this to the Dorseys.

¶66. In his trial testimony Hobbs disputed many of the Dorseys' claims, especially those regarding whether Mr. Dorsey was present on March 7, 2000. However, Mr. Dorsey's signature appears on both the credit application and the retail installment contract. Hobbs testified that Mr. Dorsey came in at a later date to sign the documents. Other than his equivocal testimony, however, there was no evidence presented to support Hobbs's claim. Also, Hobbs testified that a credit check was run on Mr. Dorsey, but he was unable to explain the lack of documents which would support this claim.

¶67. The Dealership represented that financing could be obtained, but later admitted that clearly, this was not the case. The Dealership only submitted one application for credit and it was only on behalf of Mrs. Dorsey. The record indicates that this is the case, despite the fact that the Dealership represented that it would seek financing based on both Mr. and Mrs. Dorseys's credit.

¶68. Based upon this record, a reasonable jury could easily have concluded that Dealership engaged in fraudulent conduct.

*Damages*

25

¶69. It is true, in my view, that the Dorseys presented sufficient evidence to support a claim that the Dealership's fraudulent conduct caused them to suffer mental anguish and emotional distress and medical expenses, both of which would constitute compensatory damages. However, the jury verdict form excluded damages for both of these elements. If, as it appears, the jury awarded no damages for mental anguish, emotional distress or medical expenses, then what is left? The majority provides no guidance, reference or suggestion as to what loss the $100,000 compensated, except to say:

> The damages included having their credit reputation damaged as a direct result of the Dealership's failure to pay off the loan to General Electric Credit Corporation, and the Dealership's abuse of process that occurred when it reported the vehicle stolen.

¶70. The majority pulls these two possible elements of damages from thin air. As for "having their credit reputation damaged," the majority's failure to cite evidence from the record is necessitated by the absence of any such evidence in the record. There is no testimony, document or evidence of any kind that the Dorseys were ever denied credit by anyone, or that any adverse report was made to any credit reporting service. Although one may speculate that damage to the Dorseys' credit resulted, this Court should not, in my view, approve damages based purely on speculation without one scrap of supporting evidence in the record. So inappropriate was any claim of damage to the Dorseys' credit that their counsel did not even request a jury instruction or make an argument to the jury on the issue.

¶71. As for "the Dealership's abuse of process that occurred when it reported the vehicle stolen," this is a cause of action, not an element of damages. I can certainly see a triable claim

of abuse of process from the facts in the record. But the damages awarded for that claim must be identified and presented to the jury. Stated differently, even if the Dorseys proved abuse of process, they must show what damage that abuse of process caused. Usually, abuse of process leads to legal expenses, emotional distress, and embarrassment. However, no legal expenses were presented to the jury and, as stated supra, the jury (it appears) awarded "$0 no compensation" for emotional distress. The jury was not even instructed on abuse of process. Thus, the majority takes great liberty in presuming that, without being instructed on the law of abuse of process, the jury could find that an abuse of process took place.

¶72. The plaintiff has the burden of proving damages with reasonable certainty. *Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 740 (Miss. 1999). *See also* ***Wall v. Swilley***, 562 So. 2d 1252 (Miss. 1990). "The plaintiff should not be deprived of its right to recover because of its inability to prove with absolute certainty the extent of the loss[.]" *Adams*, 744 So. 2d at 740 (*quoting* ***Billups Petroleum Co. v. Hardin's Bakeries Corp.***, 63 So. 2d 543 (Miss. 1953). "The rule that damages, if uncertain, cannot be recovered, applies to their nature, and not to their extent. **If the damage is certain, the fact that its extent is uncertain does not prevent a recovery**." *Adams*, 744 So. 2d at 740 (citations omitted) (emphasis added).

¶73. These cases, and the cases cited by the majority, clearly hold that a plaintiff is not required to prove the exact amount or extent of damages. However, the absence of a requirement to prove the exact amount of damages does not in any way obviate the plaintiff's absolute requirement to identify and present evidence of some element of compensatory

27

damages. In other words, a plaintiff seeking compensation for medical bills may not be required to prove the exact amount of those bills, but the plaintiff must certainly produce a doctor or document or evidence of some kind that the plaintiff has suffered a loss due to medical bills.

¶74. It seems obvious to me that, prior to discussing the amount of damages – certain or not – one must first establish what losses the damages are compensating. Here, I am not concerned with, or troubled by, the amount of damages awarded to the Dorseys. I just do not know what loss has been compensated.

¶75. The truth is, none of us knows what the jury intended to do in this case. From the record before us, they would certainly have been justified in finding that the Dorseys suffered medical expenses and emotional distress. After March 31, when Gray demanded that Mrs. Dorsey return the vehicle, she was required to visit the dealership several times. She was accused of theft. The police were called and police records were generated. By the time the suit was filed, Mrs. Dorsey was suffering from insomnia, anxiety and nervousness, and was being harassed by Dealership personnel. Mrs. Dorsey testified that her fear of repossession led her to quit her job at Church's Fried Chicken. She testified that she believed the Dealership would probably repossess the vehicle during the day and she feared her friends would know about the repossession if it occurred in the Church's parking lot.

¶76. Mrs. Dorsey further testified that she was embarrassed because the Dealership called her at work to tell her to return the vehicle and that employees of the Dealership had driven by

her house on several occasions. This embarrassment was in addition to that which she suffered when the police stopped and questioned her after the Dealership reported that she had stolen the vehicle.

¶77. Both Mrs. Dorsey and Donnie Scoggin, a nurse practitioner, testified about Mrs. Dorsey's visit to a local medical clinic on April 12, 2000, and the expenses she incurred. Scoggin testified that Mrs. Dorsey's visit was originally for a check up. However, when he saw her he observed that she was unusually nervous and agitated. Scoggin testified that he believed her primary problem to be nervousness/anxiety and insomnia.

¶78. Ultimately, Scoggin treated Mrs. Dorsey at the clinic for insomnia, nervousness and a preexisting urinary tract infection. Scoggin testified that he prescribed Mrs. Dorsey three medications: Celexa (antidepressant), Monurol (antibiotic) and Naprosyn (anti-inflammatory).

¶79. Clearly, there was sufficient proof of compensatory damages (emotional distress and medical expenses) to submit the issue of fraud to the jury. But fraud, like negligence, is not a compensatory damage; rather, it is the conduct or cause of action which allows one to recover enumerated compensatory damages. One wonders whether the majority would affirm or reverse a negligence case in which a plaintiff brought a claim for negligence and asked the jury for medical expenses, pain and suffering and lost wages, and the jury returned a verdict for $0 no compensation for medical expenses, $0 no compensation for pain and suffering, $0 no compensation for lost wages, and $100,000 for negligence. I see no difference here where the Dorseys sought damages for mental anguish and illness (P-3) and medical expenses (P-6),

and the jury returned a written verdict for "$0 no compensation" for those elements of compensatory damages, but $100,000 for fraud.

¶80.    This Court has never, until today, recognized "fraud" as its own element of damages. Our opinion today authorizes an instruction which provides, "If you find the defendant committed fraud, you may award an amount of money which reasonably compensates the plaintiff for lost wages, medical bills and fraud, and if you find the plaintiff suffered no damages for lost wages or medical bills, you still may award money for fraud."

¶81.    It is certainly possible that the jury attempted to award $100,000 for medical expenses and emotional distress and then, having made its award, felt it was prohibited from again writing in the amounts on the verdict form.  It is also possible that the jury attempted to award punitive damages, not knowing that they would have an opportunity to do so later.  The fact is, we simply do not know what this jury intended to do.  The record provides us no guidance whatsoever in fulfilling our obligation to make sure the $100,000 compensatory damage award  reasonably compensates the plaintiffs for a compensable loss.[8]   Indeed, we are left to speculate whether the jury recognized any compensable loss and, if so, what it was.

    *Damages – punitive*

---

[8]Compensatory damages are such damages as will compensate the injured party for the injury sustained, and nothing more; such as will simply make good or replace the loss caused by the wrong or injury. *Lee v. Southern Home Sites Corp*., 429 F.2d 290, 293 (5th Cir. 1970); *Richardson v. Canton Farm Equipment, Inc.* 608 So. 2d 1240, 1250 (Miss.1992) (citing Black's Law Dictionary 352 (5th ed.1979); *The Southland Co. v. Aaron*, 224 Miss. 780, 787, 80 So. 2d 823, 826 (1955).

¶82.    I certainly find in the record sufficient evidence of egregious conduct to justify submission of the issue of punitive damages to the jury. For instance, the jury heard the Dealership's manager, Wayne Combost, testify at trial (and confirm that he testified in deposition) that he did not call the police to report the Mountaineer stolen. However, when confronted with a tape recording of his call, he miraculously remembered the call.[9] The jury could easily have believed that calling the police to report that a vehicle was stolen is not an event one is likely to have forgotten. However, the jury returned no award of punitive damages. I believe it is far more likely that the jury intended to award $100,000 in punitive damages than some assumed damages not specified in the instructions or record. The form of the verdict leaves considerable doubt as to the jury's intent, both as to actual and punitive damages.

*The form of the verdict*

¶83.    Mississippi law presumes that jurors follow the instructions given them by the trial judge. Indeed, their oaths require them to do so. *Fielder v. Magnolia Beverage Co.*, 757 So.2d 925, 937 (Miss.1999). Ignoring the marked-through language, it appears the jury awarded $100,000 for fraud. The final sentence in instruction P-8 provides that, in order to find against the Dealership on the issue of fraud, the jury must find that the Dealership committed fraud and the Dorseys suffered damages. Then, the instructions authorizes the jury to assess damages for the Dealership's "conduct." Specifically, instruction P-8 provided:

---

[9]Frankly, I am impressed by the restraint exhibited by the trial judge and the Dorseys' counsel. A claim of weak memory does not always shield one from sanctions and/or prosecution for perjury. The Dealership was certainly aware that Combost provided incorrect testimony in his deposition. Yet, no effort was made to correct the error. Worse, the same incorrect testimony was presented at trial.

The Court instructs the jury that if you believe from clear and convincing evidence that the employees of Kim's Toyota told Mr. and Mrs. Dorsey that they had been approved from financing on the Mountaineer and that this representation was not true, and if you further believe that this statement to the Dorseys was material in getting the Dorseys to sign the Retail Installment Contract presented to them; that the employee's of Kim's Toyota knew that the Dorseys had not been approved for financing, but told the Dorseys that they had been approved with the intention of talking the Dorseys into signing the Retail Installment Contract; that the Dorseys did not know that they had not been approved for financing and relied on the representations of the employees of Kim's Toyota when they said the Dorseys had been approved for financing; and that the Dorseys had a right to rely on Kim's Toyota to tell them the truth about whether they had been approved for financing and that as a result of the misrepresentations, if any, made by the employees of Kim's Toyota regarding the financing of the Mountaineer and the fact that the Dorseys executed a *Retail Installment Contract in reliance upon those misrepresentations, if any, caused them to sustain damages, then in that event, Kim's Toyota committed fraud, and you may assess damages for its conduct*.

(emphasis added).

¶84.    The Dealership argues that the trial court did not have authority to reform the verdict to the extent that it did.  I agree.  The Dealership also says that instead of reforming the verdict, the trial judge should have entered a verdict in its favor or, in the alternative, rejected the verdict and returned the jury to reconsider the verdict.  I certainly find no clear indication from the verdict form that the Dealership was entitled to a verdict in its favor.  Although I do agree with the Dealership's contention that the trial judge should have required the jury to reconsider the verdict form, this point is of no moment now because it did not happen.

¶85.    URCCC 3.10 provides in part:

When the jurors have agreed upon a verdict they shall be conducted into the courtroom by the officer having them in charge.  The court shall ask the foreman

32

or the jury panel if an agreement has been reached on a verdict. If the foreman or the jury panel answers in the affirmative, the judge shall call upon the foreman or any member of the panel to deliver the verdict in writing to the clerk or the court. The court may then examine the verdict and correct it as to *matters of form*. The clerk or the court shall then read the verdict in open court in the presence of the jury.

If a verdict is so defective that the court cannot determine from it the intent of the jury, the court shall, with proper instructions, direct the jurors to reconsider the verdict. *No verdict shall be accepted until it clearly reflects the intent of the jury.* If the jury persists in rendering defective verdicts the court shall declare a mistrial.

(emphasis added).

¶86. The Dealership argues that because the jury provided no award of damages pursuant to instructions P-3 and P-6 which covered emotional distress and medical costs, respectively, a defense verdict is required. I do not find the jury's intent so clear. Its award of $100,000 may have been for actual damages, punitive damages or a combination of the two. Upon review of the form of the verdict returned by the jury, I believe the trial court should have required the jury to reform the verdict to the proper form so that its intent could be clearly discerned. With its zeros and marked-through words and statements unauthorized by the court's instructions, I believe this Court should decline to engage in any attempt to decipher the verdict form.

¶87. Furthermore, that the trial court, faced with an unclear verdict form, was provided two options under URCCC 3.10, *supra*. Since the trial court did not, "with proper instructions, direct the jurors to reconsider the verdict," the only remaining option was a mistrial.

II.     The Jury Instructions.

¶88.    Several issues raised in this appeal regarding jury instructions merit analysis. Where

the jury instructions actually given fairly announce the law of the case and create no injustice

when read as a whole, no reversible error will be found. ***Fielder v. Magnolia Beverage Co.***,

757 So. 2d at 929 (collecting authorities); *see* also ***Rester v. Lott***, 566 So. 2d 1266, 1269

(Miss. 1990)(The "overarching concern is that the jury was fairly instructed and that each

party's proof-grounded theory of the case was placed before it").   Both parties have the right

to embody their theories of the case in the jury instructions provided there is testimony to

support it, but only "if made conditional upon the jury's finding that such facts existed."

***Murphy v. Burney***, 27 So. 2d 773, 774 (Miss. 1946).

> ### A.       *Did the trial court err by granting instructions P-6 and P-10?*

¶89.    The Dealership says the trial judge committed reversible error by granting instructions

P-6 and P-10.  As submitted by the Dorseys, P-6 instructed:

> The Court instructs the jury that if you believe from a preponderance of the
> evidence in this case that Mrs. Dorsey became so worried and upset as a result
> of the actions of Kim's Toyota that she sought medical attention from her
> doctor, and was required to take prescription medication for her nerves, then,
> in that event, you may award her damages in an amount that you believe will
> compensate her for her *ailments.*

(emphasis added).  Instruction P-10, as submitted, provided:

> The Court instructs the jury, that as a matter of law, once the title to a vehicle
> is signed and delivered to an individual, that individual owns the vehicle. *The
> Court instructs you that the vehicle may be subject to a financing agreement,
> and that in that event, the vehicle would be subject to a lien in favor of the
> lender, but the title of the vehicle, would be the owner.*

(emphasis added). Following objections by the Dealership, both instructions P-6 and P-10 were modified prior to being submitted to the jury. P-6 was amended substituting "the cost of the prescription medicine" for "ailment." During the trial, the Dealership argued that P-6 covered mental anguish and that because there was another instruction (P-3) covering mental anguish P-6 was duplicative. The trial court believed the instruction addressed actual damages, but amended the instruction to clarify the issue.

¶90. The Dealership argues that there was no proof of proximate cause and the instruction was peremptory in nature. Because its argument on appeal differs from the that which was made before the trial court, the issue is without merit. Grounds for objections which are different from those advanced at trial cannot be presented on appeal for the first time. *Russell v. State*, 607 So. 2d 1107 (Miss.1992); *Collins v. State*, 594 So. 2d 29 (Miss.1992); *Parker v. State*, 367 So. 2d 456 (Miss.1979).

¶91. The Dealership objected to instruction P-10, and argued there was insufficient proof in the record of delivery of title. Following the objection, the trial court removed the second sentence from the instruction. However, the Dealership argues the entire instruction was erroneous because of the conditional language in the contract. As already noted, however, the Dealership's position regarding delivery of title is without merit. The three primary indicia of ownership: title, possession, and control, suggest the Dorseys owned the Mountaineer.

Because the Dorseys owned the vehicle, the non-binding language in the purchase order was of no effect.  Accordingly, this issue is without merit.

> B.      *Did the trial court err by refusing instructions D-5, D-6, D-10, D-11, and D-12?*

¶92.    The Dealership argues that the trial court committed reversible error by refusing several of its requested jury instructions. However, the Dealership does not discuss how or why the denial of these instructions warrants reversal.   Instead, it simply states that each is a correct statement of the law and therefore the denial was an error.    The Dealership fails to cite any authority supporting its position regarding D-5, D-11, and D-12.   The failure to cite relevant authority obviates this Court's obligation to review the issue. ***Williams v. State***, 708 So. 2d 1358, 1362-63 (Miss. 1998); ***Grey v. Grey***, 638 So. 2d 488, 491 (Miss.1994).    *See also* M.R.A.P.28(a)(1)(6).

¶93.    The instructions at issue are as follows:

D-5

> The proximate cause of an injury is that cause, which is natural or continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the results would not have occurred.   An element, or test, of proximate cause is that an ordinarily prudent man should reasonable have foreseen that some injury might probably occur as a result of his actions or inactions.   It is not necessary to foresee the particular injury, the particular manner of the injury, or the extent of the injury.

D-6

The Court instructs you that an agreement between two parties may include a "condition precedent." In Mississippi law, a "condition precedent" is a duty or event which must be performed or fulfilled before an agreement between the parties becomes a binding contract.

If you find, by a preponderance of the evidence in this case, that the agreement between the Plaintiffs and Kim's contained a condition precedent -- that is, that Kim's was not obligated to complete the sale of the vehicle to the Plaintiffs unless and until a bank or finance company approved the terms of the proposed sale and agreed to purchase the retail installment contract from Kim's based on such terms; and, if you further find that the terms of the sales were not approved, and the finance companies declined to purchase the retail installment contract, then there was no binding contract of sale between the parties, and your verdict must be for Kim's.

D-10

The Court instructs the jury that persons such as the Dorseys are under an obligation to read a contract before signing it, and Plaintiffs will not as a general rule be heard to complain of an oral misrepresentation or misstatement, the error of which would have been disclosed by reading the contract.

Thus, if you find, by a preponderance of the evidence, that the Purchase Order agreement signed by Mrs. Dorsey Dorsey on March 7, 2000 stated that the sale was not complete until a finance company or bank agreed to purchase the retail installment contract; and, that this fact would have been made known to the Plaintiffs by reading the Purchase Order agreement, then you must return a verdict in this cause for Kim's.

D-11

The Court instructs the jury that in order to satisfy their burden of proof on their claim for breach of contract, the Dorseys must prove, by a preponderance of the evidence, that:

a) the Plaintiffs and Kim's entered into a binding contract to sell the vehicle to the Plaintiffs on March 7, 2000; and

b) Kim's breached that agreement; and

c) Plaintiffs were damaged as a direct and proximate result of that breach, if any.

The Court further instructs the jury that if you find that there was not a binding contract to sell the vehicle to the Plaintiffs on March 7, 2000; or that Kim's did not breach the agreement with the Plaintiffs; or if you find that Kim's did breach its contract with the Plaintiffs, but that the Plaintiffs suffered no damages as a direct and proximate result of said breach, if any, then you must return a verdict in favor of Kim's.

D-12

The Court instruct (sic) the jury that if you find from the evidence, and under the instruction of this Court, that the Plaintiffs are not entitled to recover, then you must not consider the question of damages. The fact that the Court gives any instructions on the questions of damages, or that counsel may discuss such subject, is not to be taken by you as a suggestion by the Court, or an admission by counsel for Kim's is liable to the Plaintiffs in any amount whatsoever.

¶94. Proposed instruction D-5 provided an accurate description of the law of proximate cause. *See Delahoussaye v. Mary Mahoney's, Inc.*, 783 So. 2d 666, 671 (Miss. 2001) ("Proximate cause of an injury is that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred."); *Mauney v. Gulf Ref. Co.*, 9 So. 2d 780, 780-81 (Miss. 1942)(In order for a person to be liable for an act which causes injury, the act must be of such character, and done

in such a situation, that the person doing it should reasonably have anticipated that some injury to another will probably result therefrom). I note that the jury was not otherwise instructed on the issue of proximate cause. Thus, the trial judge's refusal to give instruction D-5 was error. However, because the Dealership failed to cite any authority or even discuss the issue, I believe the error was harmless.

¶95. The Dealership's argument as to D-6 and D-10 refers back to the alleged conditional nature of the contract. For the reasons already stated, I believe this argument is without merit.

¶96. The Dealership cited no authority supporting its argument as to D-11, which addresses breach of contract. Thus, I believe the issue is without merit.

¶97. Finally, failing to cite any authority concerning D-12, the Dealership simply states that D-12 is a correct statement of the law and therefore failure to give it constitutes reversible error. That is not enough to prevail on appeal.

**CONCLUSION**

¶98. This case effectively concluded with a mistrial. Neither the trial judge nor the majority can explain what the jury was trying to do. The form of the verdict was hopelessly flawed, and I therefore would reverse the judgment and remand this matter to the County Court of Jones County for a new trial ab initio on all issues, including punitive damages.

**COBB, P.J., JOINS THIS OPINION.**