## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01613-SCT

*JIMMY ABRAMS*
*AND MARY ABRAMS*

*v.*

*THE MARLIN FIREARMS COMPANY*
*AND GARY DEDEAUX d/b/a*
*GARY'S PAWN & GUNSHOP*

| | |
|---|---|
| DATE OF JUDGMENT: | 7/27/2001 |
| TRIAL JUDGE: | HON. JOHN M. MONTGOMERY |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | CHARLES M. MERKEL |
| | JACK R. DODSON |
| ATTORNEY FOR APPELLEES: | JAMES A. BECKER, JR. |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 02/27/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PITTMAN, C.J., WALLER AND CARLSON, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1.     Jimmy Abrams and his wife, Mary Abrams, appeal from a Clay County Circuit Court judgment entered in accordance with a unanimous jury verdict in favor of defendants Marlin Firearms Company and Gary Dedeaux d/b/a Gary's Pawn and Gunshop.  The Abrams claim that the trial court erred in admitting certain evidence and that the verdict was against the overwhelming weight of the evidence.  We affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2.     On October 21, 1994, Jimmy Abrams purchased a new Marlin model 336 lever action 30-30 caliber hunting rifle from Gary's Pawn and Gunshop in West Point, Mississippi. On December 30, 1994, Abrams sustained a self-inflicted gunshot wound to his right leg while inside his extended cab Toyota pick-up. The bullet entered Abrams' knee and traveled through his calf.

¶3.     Robin Minyard, a passer-by, found Abrams lying in the middle of Waverly-Ferry Road in Lowndes County. At 7:50 p.m., approximately two hours after Abrams said he shot himself, a call for assistance was placed to 911. In the meantime, Dallas Slatton, a part-time volunteer paramedic who happened to be in the area, attended to Abrams and noted he was quite coherent given his condition. He testified as to the presence of alcohol on Abrams' breath and tire tracks leading from nearby property to Abrams' pick-up. Upon questioning by Slatton, Abrams confirmed that he had been spotlighting deer.[1] Inside the pick-up, Slatton noticed beer bottles both empty and full, a fresh pool of blood in the floorboard, rifles on the passenger side, and a Q-Beam handheld spotlight plugged into the dash. Paramedics transported Abrams to Baptist Hospital in Columbus where, despite all efforts, his leg became necrotic and gangrenous and had to be amputated above the knee eleven days later.

---

[1]Slatton testified that the reason he questioned Abrams was to keep him alert and talking to keep him alive.

## Abrams' Theory of the Case

¶4.	According to Abrams, on December 30, 1994, he traveled to his mother's house to target practice[2] and sight the scope for the new Marlin. When he finished shooting the Marlin, he cycled a live round into the chamber and uncocked the hammer.[3] At approximately 5:30 p.m. he attempted to place the Marlin across the backseat of his pick-up when, as he sat on the driver's seat and swung the Marlin between the front seats, the rifle struck the chromed headrest post on the passenger seat hitting the closed hammer and causing the rifle to fire. He alleged the bump firing was due to the defective design of the Model 336 rifle.

¶5.	Abrams testified that he tied a piece of wire around his leg to slow the bleeding. He started his manual transmission truck by pressing a clutch release button and drove to his mother's house nearby. He testified that he did not stop at his mother's house for help since no one was home but instead attempted to drive himself to the hospital.

## Marlin's Theory of the Case

¶6.	Marlin's theory of the case was that the rifle was not defective and that Abrams' own negligence, inattention, and misuse of the rifle were the causes of his injuries. It contended the cause of the accident was a full-cocked discharge[4] of the rifle.

¶7.	Marlin further asserted that Abrams could not have possibly shot himself at the time and place he said he did and expect to survive over two hours in that condition. Abrams testified that he shot himself at approximately 5:30 p.m. near his mother's house in New Hope in Lowndes County. This is

---

[2]In addition to the Marlin, Abrams also had with him a Winchester rifle, a .22 caliber Browning semi-automatic rifle, and an SKS military-type rifle.

[3]The Model 336 rifle is equipped with a cross-bolt safety mechanism; however, Abrams never engaged it or knew the rifle was equipped with it.

[4]A full-cocked discharge is a normal firing by pulling the trigger.

approximately fifteen miles and a twenty-minute drive to the spot where he was found and which is on the other side of the hospital from his mother's house. Rather, Marlin submitted that Abrams shot himself in the woods near Waverly-Ferry Road less than half an hour before he was found.

Course of Proceedings Below

¶8. Abrams filed this products liability action against Marlin and Gary's Pawn and Gunshop alleging the Marlin 30-30 was defective, unreasonably dangerous, and discharged without a trigger pull. The trial court granted Abrams' motion in limine to exclude evidence of prior misdemeanor convictions for spotlighting deer, driving under the influence, and assault and battery; evidence of Abrams' possible consumption of alcohol prior to the accident; and evidence that Abrams was hunting deer illegally at the time. After reconsideration prior to trial, the trial court allowed Marlin to inquire into the possible alcohol consumption and illegal hunting.

¶9. At trial, Abrams presented expert testimony that the Marlin rifle was defective because it lacked a passive safety device to prevent the rifle from accidentally discharging when the hammer is uncocked and placed against a live round. However, neither expert could rule out the possibility of a full-cocked discharge. Determining exactly how the rifle fired was hindered greatly by the loss of the spent shell casing, since a bump-fire would leave a different firing pin indentation than would a normal firing.[5]

¶10. Evidence of proper gun handling techniques as it related to Abrams' handling of the rifle was also presented. Lorne Smith, Jr., a former hunter education instructor, testified as follows about Abrams' violation of various "commandments" of firearms safety:

---

[5]Following the injury, game warden Ben Kilgore confiscated all of the rifles in Abrams' truck and the rounds in them. The rifles and live rounds were subsequently returned to Abrams; however, the spent hull and projectile from the Marlin were turned over to Lowndes County Sheriff's deputies working the case, and no one can account for their whereabouts.

The first would be–the first commandment says to treat every firearm with the same respect due a loaded gun. So any firearm that you're handling you treat it as if it is loaded so if an accident happens then you've got it pointed in a direction where no one gets hurt. The second commandment says to control the direction of the firearm's muzzle. If he would have controlled the direction of the muzzle even if it had gone off, then he would not have shot himself. The third commandment that he violated was unload firearms when not in use. Leave the actions open. Firearms should be carried empty in cases to and from shooting areas so they should be unloaded and carried in cases from one area to the other or from the shooting range back to the house or wherever. The fourth one says never point a firearm at anything you don't intend to shoot. If you don't intend to shoot something, then you don't point the gun at it. The fifth one says store firearms and ammunition separately beyond the reach of children and careless adults. And the sixth one says to avoid alcoholic beverages and other mood-altering drugs while or during shooting.

¶11.    After hearing evidence on theories of negligence and strict products liability, a jury returned a unanimous verdict in favor of Marlin and Gary's. Abrams' motion for a new trial was denied, and he appeals asserting as error that the verdict was against the overwhelming weight of the evidence and the admission of the evidence of alcohol consumption and illegal hunting.

## DISCUSSION

### I.    WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF ALCOHOL CONSUMPTION AND ILLEGAL DEER HUNTING.

Standard of Review

¶12.    Determining the relevancy and admissibility of evidence is within the discretion of the trial judge, and we will reverse only in the event that discretion has been abused. *Rials v. Duckworth*, 822 So. 2d 283, 287 (Miss. 2002); *Brandon HMA, Inc. v. Bradshaw*, 809 So. 2d 611, 618 (Miss. 2001); *Buel v. Sims*, 798 So. 2d 425, 429 (Miss. 2001); *Herring v. Poirrier*, 797 So. 2d 797, 804 (Miss. 2000).

A.  Evidence of Possible Alcohol Consumption

5

¶13. Abrams contends that the trial court erred in admitting evidence of his possible alcohol consumption. Dallas Slatton testified that he smelled alcohol on Abrams' breath as he attended to Abrams and noted the presence of beer in the truck. Ben Kilgore, a game warden with the Department of Wildlife, Fisheries and Parks, also testified as to the presence of alcohol in Abrams' pick-up. His report of the incident stated as much in pertinent part:

> In the vehicle there was a very large pool of blood in the floor board of the driver's side. On the seat was a Q Beam which was plugged into the lighter outlet. There were two rifles on the seat. One was a bolt action 30-30 with a scope. The other was a twenty two rifle. There was a sack on the seat of the passenger side. It contained two unopened Natural Lite beers [and] one empty Natural Lite beer bottle. These were in the Natural Lite six pack carton. The two unopened beer bottles were very cold when I felt of them. There was also a Natural Lite beer bottle in the drink holder on the dash. It was about 1/4 full.

David Minyard, whose wife initially found Abrams lying in the street and called him for assistance, testified to the same effect.

¶14. Specifically, Abrams claims reversible error and asserts there was no evidence that alcohol had anything to do with the accident and the proof never established that he was actually intoxicated. Marlin responds that the evidence was relevant to show negligence, credibility and causation.

¶15. Abrams relies heavily on our decision in *Donald v. Triple S Well Service, Inc.*, 708 So. 2d 1318 (Miss. 1998). In *Donald*, a case in which the plaintiff slipped and fell while working on a gas well, the defense elicited testimony that Donald's breath smelled of alcohol on prior occasions while on the job. 708 So. 2d at 1322. However, Triple S did not produce a witness that actually observed Donald drinking. *Id.* at 1324. We held that the evidence never established that Donald had a habit of drinking on the job. *Id.* at 1323. We also noted that while possibly admissible under Miss. R. Evid. 406, it was unfairly prejudicial under Miss. R. Evid. 403. *Id.* at 1324. Regarding admissibility of such evidence, we held,

"Testimony of alleged alcohol consumption should not be allowed before the jury without a minimal showing of admissibility or *causal connection between the alleged consumption of alcohol and the accidents* involving Donald." **Id.** (emphasis added).

¶16.    **Donald** dealt with the admissibility of evidence of alcohol consumption to establish a habit of drinking. The Court of Appeals' decision in **Hageney v. Jackson Furniture of Danville, Inc.**, 746 So. 2d 912 (Miss. Ct. App. 1999), is more on point in that it deals with evidence of drinking just prior to the event in question in the context of a products liability action. The Hageneys brought a products liability action for injuries Tim Hageney sustained when a bar stool collapsed under his weight. 746 So. 2d at 915. The trial court admitted evidence over a motion in limine that the Hageneys were drinking at the time of the accident. **Id.** at 920. Specifically, "the trial court found that the Hageneys's state of sobriety was relevant in the jury's assessment of their credibility in relating the events surrounding the incident, and Tim's consumption of alcohol was relevant to the issue of whether Tim was contributorily negligent." **Id.** (citing **Miss. Power & Light Co. v. Lumpkin**, 725 So. 2d 721 (Miss. 1998)). The Court of Appeals concluded the trial court did not abuse its discretion when allowing the evidence. **Id.**

¶17.    Though not cited by either party in their briefs, our decisions in **Accu-Fab & Const., Inc. v. Ladner**, 778 So. 2d 766 (Miss. 2001), and **Pope v. McGee**, 403 So. 2d 1269 (Miss. 1981), warrant discussion and distinction. In **Accu-Fab**, a case where the decedent fell through a hole in a roof at a construction site, evidence of a marijuana cigarette found in Ladner's pocket and evidence of marijuana use were found to be irrelevant because there was no showing that the marijuana impaired Ladner. 778 So. 2d at 772. In **Pope**, a case involving an automobile accident, we held that evidence of two six-packs of warm beer and some unidentified white powder were inadmissible because there was no proof of the

driver's being intoxicated or impaired. 403 So. 2d at 1271. In this case, however, there is proof of alcohol use–namely, Slatton's testimony of smelling alcohol on Abrams' breath while administering aid to him.

¶18.    In the instant case, there was evidence of cold beer in Abrams' pick-up and the smell of alcohol on his breath. In our opinion, evidence of possible alcohol consumption just prior to the accident was highly relevant and probative as to Abrams' credibility, his recollection of the accident since there were no other witnesses, and his contributory negligence.

### B. Evidence of Possible Illegal Deer Hunting

¶19.    Abrams also argues that evidence of possible illegal spotlighting of deer was completely irrelevant because the accident occurred inside the pick-up. Marlin counters arguing that the evidence was not probative that Abrams was participating in illegal activity but that the evidence was probative on the issue of his negligence. Marlin's position is that "the jury may have reasonably concluded that Abrams'[s] spotlighting activity explained why he had a loaded rifle with the safety off in the confined space of his pick-up truck."

¶20.    Abrams' only support of his argument is *Shields v. Carnahan*, 744 P.2d 1115 (Wyo. 1987). *Shields* was a medical malpractice case in which the doctor elicited evidence that the plaintiff "was on a late night trip with a man other than her husband." *Id.* at 1116. The Supreme Court of Wyoming reversed and remanded, holding that "[u]nder the circumstances, whether appellant was on a late night trip with a man other than her husband, or whether that man had been drinking before he drove the accident vehicle had nothing to do with the malpractice issues involved in this case." *Id.* at 1116-17.

¶21.    We disagree with Abrams' reliance on *Shields*. *Shields* dealt with pre-accident conduct completely irrelevant to the underlying issue of medical malpractice–an issue totally unrelated and unconnected to the pre-accident conduct. In the instant case, however, the evidence supports Marlin's

8

theory and established a causal connection that Abrams may have been spotlighting at the time and that the accident was a result of a full-cocked discharge, for he was in the cab of a compact pick-up pointing a loaded deer rifle at himself with its safety disengaged in violation of countless gun-handling principles. Slatton testified that he saw mud on Abrams' pick-up and a Q-Beam spotlight plugged into the dash and tracks leading to the pick-up from the property near the spot where he was found. Slatton also testified that, as he was administering first-aid to Abrams and talking to him to keep him alive, Abrams admitted he was out spotlighting. Such evidence is very relevant under Miss. R. Evid. 401, and its probative value is not outweighed by unfair prejudice. Miss. R. Evid. 403.

¶22. It is inherent that nearly all evidence is prejudicial to a party in one way or another. The inquiry as it regards admissibility is whether that prejudice is unfair. Miss. R. Evid. 403. "Unfair prejudice," according the Advisory Committee Note to Fed. R. Evid. 403, "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." The possibility of illegal spotlighting was supported by the evidence and was meant to explain Marlin's theory of the accident, Abrams' credibility as a witness, and his recollection of how the accident occurred, not to evoke rancor against Abrams within the jury. The activity of spotlighting was contemporaneous to the accident, and it surely cannot be said that the *only* manner in which the accident occurred was the manner to which Abrams testified, which was a hammer-down bump fire while entering his pick-up after target shooting. Given the testimony of tire tracks leading from the nearby property and the fact that Abrams was found approximately fifteen miles from his mother's house when the hospital was not even remotely close to where he was found, we hold that admission of this evidence was not an abuse of the trial court's discretion.

## II. WHETHER THE JURY'S VERDICT IS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.

9

¶23. Abrams argues that the jury's verdict is against the overwhelming weight of the evidence on two bases. First, there is no credible evidence that the accident occurred in any manner different than how he described it. Second, all witnesses agreed that the Marlin 30-30 would fire if the hammer was struck and that this problem could have been eliminated by a passive safety device.

¶24. It is the province of the jury to determine weight and worth of testimony and the credibility of witnesses at trial. *Upchurch ex rel. Upchurch v. Rotenberry*, 761 So. 2d 199, 205 (Miss. 2000); *Wilmoth v. Peaster Tractor Co. of Lexington, Inc.*, 544 So. 2d 1384, 1386 (Miss. 1989); *Burnham v. Tabb*, 508 So. 2d 1072, 1077 (Miss. 1987); *Travelers Indem. Co. v. Rawson*, 222 So. 2d 131, 134 (Miss. 1969). We will, however, reverse if the verdict is against the overwhelming weight of the evidence and credible testimony presented. *Ducker v. Moore*, 680 So. 2d 808, 811 (Miss. 1996); *Parker v. Thornton*, 596 So. 2d 854, 858 (Miss. 1992); *Roberts v. State Farm Mut. Auto. Ins. Co.*, 567 So. 2d 1193, 1196 (Miss. 1990).

¶25. Contrary to Abrams' contentions, there is credible evidence supporting the jury's unanimous verdict. Abrams cites little persuasive authority in support of his argument. The evidence supports a reasonable inference that Abrams was in fact not at his mother's house when he shot himself and that the accident occurred contrary to his recollection of events. Furthermore, the timing of the accident according to Abrams in relation to when help arrived (approximately two hours), the location where he was found in relation to the location of his mother's house and the hospital, the fact that Dallas Slatton smelled alcohol on Abrams' breath, and the fact that Ben Kilgore noted the beer in Abrams' truck was very cold all allowed the jury to infer and conclude that the accident occurred other than as Abrams recalled and/or was a result of his contributory negligence. The evidence simply does not reasonably preclude a conclusion of a full-cocked discharge as Marlin asserts. *See Shields v. Sturm, Ruger & Co.*, 864 F.2d 379 (5th Cir.

1989) (applying Mississippi law) (affirming jury verdict in favor of defendant gun manufacturer in products liability action where plaintiff alleged a .357 Magnum revolver was defective when bump-fired inside vehicle into plaintiff's leg and defendant alleging plaintiff's negligence caused accident).

**CONCLUSION**

¶26.    While we certainly sympathize with Abrams for the great loss he sustained, the fact  remains that he was unable to convince a jury that the accident occurred as he described due to a defective Marlin rifle. The evidence about which he complains is relevant and probative, and we cannot say that the trial court abused its discretion in admitting it.  We affirm the judgment entered in accordance with the unanimous jury verdict in favor of the defendants Marlin Firearms Company and Gary Dedeaux d/b/a Gary's Pawn and Gunshop.

¶27.    **AFFIRMED.**

**PITTMAN, C.J., SMITH, P.J., COBB, EASLEY, CARLSON AND GRAVES, JJ., CONCUR.  McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J.**

**McRAE, PRESIDING JUSTICE, DISSENTING:**

¶28.    The admission of evidence of possible illegal deer hunting had no probity whatsoever and was unfairly prejudicial.  This case should therefore be reversed and remanded for a new trial.  Whether Abrams was illegally hunting deer, or even legally hunting deer, is of no probative value as to whether a loaded gun, regardless of why, where, or when it was loaded, had a manufacturing defect or whether Abrams was negligent.

¶29. In this case, the only relevant fact concerning Abrams and the issue of defect or negligence, is how the gun was loaded and fired. Deer hunting has nothing to do with how a gun is loaded or fired. Moreover, even if a strained case of relevance can be made, as was done here, the prejudicial effect of illegal hunting far outweighs such an attenuation. Admission of evidence of illegal activity, when not relevant or even remotely relevant, serves only one purpose: it prejudices and sways the jury by destroying a party's character and integrity.

¶30. The majority, however, justifies the admission of possible illegal deer hunting on the notion that "it is inherent that nearly all evidence is prejudicial to a party one way or another;" and it further elaborates that evidence of illegal hunting was "not to evoke rancor against the plaintiff with the jury." This catch-all, "oh-it's-no-big-deal" type of justification is far too slender a reed upon which to hang admission of irrelevant and prejudicial evidence in a product defect case. Abrams was prejudiced when this information was put before the jury. I would reverse and remand for a new trial. Accordingly, I dissent.

**DIAZ, J., JOINS THIS OPINION.**