# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-KA-01970-SCT

*BRAD HARDY a/k/a BRADY HARDY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/22/2012 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHRISTOPHER MICHAEL FALGOUT |
| | ANDY DAVIS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/01/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., PIERCE AND KING, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Brad Hardy appeals his conviction in the Circuit Court of Rankin County of two counts of manslaughter by culpable negligence and one count of aggravated boating under the influence of alcohol resulting from a boating collision.  He was sentenced to forty-four years, with twenty-six to serve.  Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2. Brad Hardy crashed his boat at high speed into two docked boats, up a river embankment, and onto a campsite occupied by adults and children on Memorial Day weekend in 2010. A jury trial was held from October 15, 2012, through October 17, 2012.

¶3. The State presented the following pertinent evidence through numerous witnesses and exhibits:

¶4. Virginia Martin testified that, on the day of the fatal collision, she was camping on the Pearl River across from the impact area, a short distance from Dead Man's Curve.[1] She testified that she "heard a really loud boat coming and turned around." She saw Hardy's "small boat going really fast, and [Hardy] was standing up driving it, which is a no-no. . . . Hardy came around Dead Man's Curve and just turned . . . and hit the bank and went up onto the bank . . . . He hit some boats, and then hit the bank, went up on the bank, and the boat landed between two trees on the other side of the river." Martin testified that she saw "hundreds" of boats that weekend, and witnessed no other boat being operated in that manner. She further testified that Hardy "turned in and went straight towards [the campsite] across from us." She said Hardy never warned the campers by yelling or waiving his arms. Martin said that Hardy did not appear to have "any difficulty whatsoever in operating the boat." On cross-examination, Martin reaffirmed that Hardy did not have any problems operating the boat. She also testified that she could see from "above his knees up, because he was standing up and holding the steering wheel." She testified that she overheard a little girl on the bank scream "you killed my daddy."

---

[1]Dead Man's Curve is a sharp curve in the Pearl River (akin to a ninety-degree angle) that is immediately downriver from the campsite involved in the case *sub judice*.

¶5.     Officer Steven Westerfield of the Department of Wildlife and Fisheries (DWF) testified that, while at Ratliff's Ferry, he received at call at 7:15 p.m. about a boat collision upriver. When he arrived on the scene, he noticed a green boat and a yellow boat. The deceased, Mikael Hardy and Roger Gibson,[2] were in the yellow boat. He testified that the river bank was six feet high. He found Hardy's blue boat twelve feet inland. On the bank, Westerfield found another victim, William Hulett, bleeding severely. After managing to send Hulett with another officer to get medical assistance, Westerfield identified the defendant as the operator of the blue boat. Westerfield testified that "[t]he throttle position was in the wide open position." The throttle was "pushed all the way forward as far as it could go . . . [i]t was maxed out. It could not go any faster." Westerfield observed damage to a tree eight feet above the ground level. The boat had reached a height of fourteen feet above water level and was twelve feet inland. Westerfield measured the distances, and the boats, tree, and fatalities were photographed.

¶6.     Westerfield also found "visible alcoholic beverage containers" in Hardy's boat. He testified that empty beer cans littered the boat. As Westerfield approached Hardy, he "smell[ed] a strong alcoholic odor coming from [Hardy]." Westerfield requested a field sobriety test, but Hardy refused. Hardy stated that he had returned from getting alcohol, and admitted to consuming six beers. Westerfield then detained Hardy and took him to Ratliff's Ferry to administer a breathalyzer test to Hardy. Hardy blew .09 at 8:39 p.m.[3] Westerfield

---

[2]Mikael was the father of the defendant.

[3]At the time, the legal limit for operating a boat was .10. The legal limit was amended to .08 on July 1, 2010. Miss. Code Ann. § 59-23-7(1)(c) (Rev. 2013).

3

"observed that [Hardy] had been drinking and that he was impaired." Westerfield testified that if he witnessed "someone driving the defendant's boat in a standing position," he "would cite that subject for reckless operation." Hardy's boat "was designed to be operated sitting down." Westerfield's report was introduced into evidence. In his report, he had checked "alcohol use," "careless/reckless" operation, "excessive speed," and "steering system" as causes of the collision, since Hardy stated that he "lost control of the steering and that the boat took a right turn." On cross-examination, Westerfield said he presented the case to the grand jury because "there were two fatalities, one man was maimed . . . alcohol was involved . . . careless, recklessness, excessive speeds." Sea-Tow was called to remove the boats. He testified that it was not policy to "leave [boats] in the river," for they had to be removed for "public safety." The boats were stored at Sportsman's Marina.[4] Westerfield testified that he did not know how long the boats were kept, but found out later they were sold. He testified that he "did not give permission nor [did] my department" to sell the boats. Westerfield identified four pictures in evidence that reflected the damage to the steering cable of Hardy's boat. On redirect, Westerfield testified that the actual cause of the collision was "excessive speed." He testified that there was no evidence of throttle failure. On the accident report, Westerfied had checked the "over 40 mph" box, the highest speed available on the report. Westerfield testified that he did not cite Hardy for any boating violations because they "have to happen in my presence."

¶7.     Teresa Gibson, the wife of the deceased Roger Gibson, testified that she had witnessed Hardy "run over" her husband. Immediately before witnessing her husband's

---

[4]Reflected in the record as the "Sportsmen Mariner."

death, she testified that she "heard [Hardy] coming" and heard "[Hardy] speeding." After hearing Hardy approaching, she turned toward the river. She witnessed Hardy operating the boat. "I seen him with a can in his hand." She testified that Hardy was "full throttle" and never slowed down. When Hardy reached the bank, she testified that the boat went airborne "over my head and behind me . . . . When he landed behind me, it was still full throttle." Gibson testified that, after Hardy's boat had landed, Hardy asked "what had he just did." She testified that her daughter was burned by metal from one of the boats. She testified her husband died instantly. On cross-examination, she repeated that the boat "was full throttle," and was "still full throttle" when the boat "landed behind [her]." She testified that the boat never slowed down.

¶8.     Officer Randy Newell testified that Hardy stated "[a]ll we were doing was having fun; I was just trying to spray them and have fun; I didn't mean to hurt anybody." Later, Newell heard Hardy make a similar statement while at the University of Mississippi Medical Center. Hardy stated, "All I was doing was trying to spray them; we were just having fun; I didn't mean to hurt anybody." Newell testified that all three boats were taken to Sportsman's Marina. Newell testified that the marina is a gated area, and he did not have any reason to believe the boats would not be secure there.

¶9.     Luke Estes testified that Hardy's campsite was on the other side of the river, close enough that "you could holler back and forth." Estes testified that "[Hulett] was sitting beside me to my right," and "Teresa [Gibson] was to my left . . . children were playing in the water." Estes heard a boat and saw Hardy coming up the river. Estes testified that he saw Hardy turn and "start[] angling straight toward us." Hardy "just kept at the same speed, a fast

5

speed." Hardy "went straight to the camp." Estes testified that he "thought [Hardy] was going to spray them or something." Estes testified that "I was looking at him, and he just had this look on his face like nothing was wrong . . . . I was looking dead at him," thinking "what's he doing . . . By the time I realized he wasn't going to turn, he had run over me." Estes testified that Hardy never yelled and "never let off the boat, never hollered, no motion at all." Hardy "was just planed out, coming on in."

¶10. Estes also was struck by Hardy's boat. Afterwards, he saw "a hunk of meat missing" from Hulett's arm. Estes testified that "you could put your fist in there." Estes also testified that he saw empty beer cans in Hardy's boat. After seeing that Mikael and Roger were dead, Estes approached Hardy. Hardy asked Estes "what have I done." Estes replied "you just run over Roger and your daddy . . . . You killed both of them, . . . that's probably manslaughter 2."

¶11. Hulett testified that, earlier in the day, Gibson had sprayed water into Hardy's and Mikael's boats. Hulett testified that Gibson was on a jet-ski at the time. Gibson had maneuvered the back of the jet-ski toward Hardy's and Mikael's boats and "gassed on it and sprayed some water [20-30 gallons] in the boat." Disgusted, Hardy stated that "he wasn't never coming back to the river." Hardy then went downriver, toward Ratliff's Ferry. Later that evening, Hulett was at the campsite with Gibson, Estes, Teresa, and Mikael, along with several children. Hulett heard somebody yell "here he comes." Hulett heard the boat and turned to run. He said he "made several steps before [Hardy's boat] struck me." Hulett testified that he was a carpenter, but he is no longer able to work as a carpenter because his "left arm is disabled" from the incident. On cross-examination, Hulett testified that, after the

6

boat came to rest, "[t]he motor was racing . . . and then the motor said 'whaam,' and everything got quiet." Hardy then looked at Hulett and asked "what happened."

¶12. Officer William Hudson testified that Hardy stated "that he was going to go in and spray them or splash them."

¶13. Jason Register witnessed the tragedy alongside Virginia Martin, across the river. He testified that he "witnessed a guy coming around Dead Man's Curve at a high rate of speed. He go in front of us and made a sharp right and was heading to the bank. I thought he was pulling up and slowing down, but he never did. He just went up on the bank." Register testified that he had never seen any boats come around Dead Man's Curve in that manner before. Register said he witnessed Hardy standing in the boat. Register testified that Hardy never yelled and never made any motions with his arms to signal trouble. Finally, Register testified that Hardy did not appear to have any problems operating the boat.

¶14. After the State rested and the trial court overruled Hardy's motion for a directed verdict, Hardy called several witnesses. Captain Calvin Fulton testified that he first viewed the boat on June 1, 2010. He went to Sea-Tow to view the boat as part of an interview with a reporter for a local TV news report. Fulton described the area where the boat was as a "kind of impound yard." He testified that he told the reporter in the interview that there was "a possibility that there was a steering malfunction." Fulton testified that he informed the reporter that "whether that fault was pre-impact or post-impact was yet to be determined." Fulton testified that there was no response when he tried to turn the steering wheel. Fulton testified that he did not find out that the boats were no longer at Sea-Tow until sometime later. On cross-examination, Fulton testified that the "steering cable is like a straw . . . .

7

When a straw has a hard impact, it makes a kink." Fulton then pointed out the "kink" in the steering cables as seen in the picture exhibits. Fulton testified that he teaches "accident reconstruction" classes.

¶15. Major Jerry Carter testified about the Boating Accident Report Data (BARD).[5] He testified that the report "indicated a possible steering malfunction." However, the report listed "alcohol use" and "navigation rules violation" as the two causes of the incident. When asked to explain "navigation rules violation," Carter testified that it meant speeding and operating the boat in a reckless manner.

¶16. Officer Chris Harris testified that the department was "not denying that Sea Tow sold [Hardy's] boat." But, Harris testified that he did not give them permission to sell the boat. When asked to clarify, he said that the "boats were sold without the knowledge of the Department of Wildlife and Fisheries."

¶17. The jury found Hardy guilty of two counts of culpable negligence manslaughter and one count of aggravated boating under the influence of alcohol. Hardy was sentenced to eighteen years for each count of manslaughter and eight years for aggravated boating for a total of forty-four years, of which eighteen were suspended, leaving twenty-six years to serve. Hardy appeals those convictions.

## ISSUES

¶18. Hardy raises numerous points of error, restated as follows:

> I. **Whether the trial court erred in denying the motion to dismiss for law enforcement misconduct and/or gross negligence.**

---

[5]This is a report required by the United States Coast Guard.

II.     **Whether Hardy was denied his constitutional right to a speedy trial.**

III.    **Whether the trial court erred in denying Hardy's motion in limine to exclude evidence of alcohol consumption.**

IV.     **Whether the trial Court erred in granting the State's motion in limine to exclude the DVD.**

V.      **Whether the trial court erred in denying Hardy's motion for directed verdict due to a defective indictment.**

VI.     **Whether the trial court erred in refusing Jury Instructions D-1, D-2, D-3, D-5, D-6 and D-11.**

VII.    **Whether there was sufficient evidence of the elements of culpable negligence manslaughter to convict Hardy.**

VIII.   **Whether Hardy's right against double jeopardy was violated when he was convicted of both culpable negligence manslaughter and aggravated boating under the influence.**

IX.     **Whether the trial court showed bias and/or prejudice to Hardy.**

## ANALYSIS

I.      **Whether the trial court erred in denying the motion to dismiss for law enforcement misconduct and/or gross negligence.**

¶19.    "In reviewing rulings of a trial court regarding matters of evidence, relevancy and discovery violations, the standard of review is abuse of discretion." ***Montgomery v. State***, 891 So. 2d 179, 182 (Miss. 2004) (citing ***Conley v. State***, 790 So. 2d 773, 782 (Miss. 2001)).

¶20.    "Pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, criminal prosecutions must comport with prevailing notions of fundamental fairness." ***Freeman v. State***, 121 So. 3d 888, 895 (Miss. 2013) (citing ***California v. Trombetta***, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984)).

9

"[T]he [Supreme] Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *Trombetta*, 467 U.S. at 485 (internal citation omitted). "[T]his group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Freeman*, 121 So. 3d at 895 (citing *Trombetta*, 467 U.S. at 485).

¶21. Four years after *Trombetta*, the Supreme Court clarified the duty and held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988). The Court noted its "unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance." *Id.*

¶22. Just last year in an opinion authored by Justice King, this Court unanimously reaffirmed our standard in spoilation-of-evidence cases. *Freeman*, 121 So. 3d at 895. In order to determine whether the State's loss of evidence violates the defendant's due-process rights, the defendant must show that:

> (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*Id.*

10

¶23. Hardy argues that the trial court violated due process by not dismissing the case due to the spoilation and/or destruction of Hardy's boat. Hardy relies on two cases, **Brady v. Maryland**[6] and **Banks v. State**,[7] neither of which is applicable. **Brady** speaks to the suppression of evidence, not spoilation cases. **Banks** deals with destruction of evidence. No allegation of destruction exists here. Finally, Hardy points to Section 99-49-1(4) of the Mississippi Code, which Hardy argues places an affirmative duty on the State to preserve all evidence in a manslaughter case.[8]

¶24. It is clear that the loss of Hardy's boat was not due to the State's action, either by disposing of it in bad faith, or by conscious effort to suppress evidence. Thus, we are left with a failure-to-preserve issue. The Supreme Court has held that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." **Youngblood**, 488 U.S. at 57. "We think that requiring a defendant to show bad faith . . . limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it." **Id.** at 58. "We therefore hold that

---

[6]**Brady v. Maryland**, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[7]**Banks v. State**, 725 So. 2d 711 (Miss. 1997)

[8]Section 99-49-1(4) of the Mississippi Code imposes a duty on the State to preserve evidence that is in the possession of the State. Miss. Code Ann. § 99-49-1(4) (Rev. 2007). The boat was never moved from Sportsman's Marina. The State was never notified it was being sold. The statute governing its sale does not require notice to the State, only to the registered owner. *See* Miss. Code Ann. § 85-7-251 (Rev. 2011). Thus, Section 99-49-1(4) is not applicable.

11

unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." *Id.*

¶25. Pictures of the steering mechanism preserved visual evidence of a severely kinked steering cable. No evidence was offered that Hardy was unable to locate the boat, only that the boat was no longer at Sportsman's Marina. The State was ambivalent on Hardy's claim of steering failure and conceded there was a possibility of steering failure, as reflected in their reports and testimony. The State's case relied on eyewitness testimony and the investigating officers to establish Hardy's precollision actions. Ample evidence was presented to the jury that Hardy operated the boat while impaired, while standing, at excessive speed; failed to reduce his speed; failed to warn others; and stated several times that he was only going to splash the victims. Assuming steering failure occurred after he pointed the speeding boat toward the victims does nothing to exonerate Hardy of the litany of actions that created the fatal collision. Assuming a steering failure occurred (not one person witnessed such an event) would not absolve him of his failure to reduce his speed and to provide warning to the victims and others in the immediate vicinity. Unlike *Banks*, there is not a scintilla of evidence in the case *sub judice* that the State acted to prevent the defendant from locating the boat. No proof was offered of destruction or suppression of the boat by the State. Therefore, the trial court did not err in denying Hardy's Motion to Dismiss for Law Enforcement Misconduct and/or Gross Negligence.

**II.     Whether Hardy was denied his constitutional right to a speedy trial.**

12

¶26.    Following ***Barker v. Wingo***,[9] this Court considers four factors when a defendant

alleges that his or her constitutional right to a speedy trial has been violated: (1) the length

of delay; (2) the reason for the delay; (3) whether the defendant asserted his right; and (4)

prejudice to the defendant. ***Ben v. State***, 95 So. 3d 1236, 1242 (Miss. 2012).  "None of these

four factors is 'a necessary or sufficient condition to the finding of a deprivation of the right

of speedy trial.'" ***Id.***  "All, rather, are related and must be considered alongside other relevant

circumstances." ***Id.***

¶27.    We analyze each of the four factors in turn.

        *i.*       *Length of the Delay*

¶28.    "The Sixth Amendment speedy-trial right attaches at the time of formal indictment

or information or arrest—whichever occurs first." ***Id.***  "In Mississippi, a delay of more than

eight months is considered presumptively prejudicial." ***Id.***

¶29.    Here, Hardy was indicted on June 16, 2011.[10]  Four hundred eighty-five days passed

before trial commenced.  As the delay exceeded eight months, this prong weighs against the

State.

        *ii.*      *Reason for the Delay*

¶30.    We have stated:

    Deliberate attempts to delay the trial in order to hamper the defense are
    weighed heavily against the State. On the other hand, "[a] more neutral reason
    such as negligence or overcrowded courts should be weighted less heavily but

---

    [9]***Barker v. Wingo***, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

    [10]Hardy was detained and transported to a location to take the field sobriety test.  He
was later released without being charged with a crime.

nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant."

*Id.* at 1242-43 (internal citations omitted).

¶31.   The trial originally was set for February 13, 2012.  At a pretrial hearing held on February 6, 2012, the trial court denied Hardy's motion to dismiss for law enforcement's misconduct and/or gross negligence.  Hardy advised the court of his intent to file an interlocutory appeal.  The trial court postponed the scheduled trial to accommodate Hardy's intended interlocutory appeal.  However, Hardy never presented an order, and never filed an interlocutory appeal.  Instead, on March 7, 2012, both parties entered an *agreed order* continuing the trial to August 13, 2012.  This delay was prompted by Hardy, and he agreed to the continuance.  This factor does not weigh against either party, as the only unexplained delay was slightly less than eight months.

¶32.   On August 13, 2012, the State moved to postpone trial to August 20, 2012, due to a scheduling conflict with one of the State's witnesses.  That same day, the parties entered another *agreed* order postponing the trial to October 15, 2012.  This prong weighs slightly, if at all, against the State.

  iii.   *Assertion of the Right to a Speedy Trial*

¶33.   "Ordinarily, a defendant's failure to assert his right to a speedy trial weighs heavily against him." *Id.* at 1244.  "Indeed, this Court has 'repeatedly held that a defendant's failure to assert his right to a speedy trial must be weighed against him.'" *Id.* (citations omitted).

14

¶34.    Here, Hardy filed a motion for speedy trial and a demand for speedy trial on August 9, 2012, three days before the trial date.  The trial court did not rule on the motion as trial was already scheduled.

       *iv.*     *Prejudice to Hardy*

¶35.    We have held:

> Prejudice must be assessed in light of the interests that are designed to be protected under the right to a speedy trial. **Barker** identifies three such interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." The last is the most serious. Possible impairment to one's defense includes the unavailability of witnesses or witnesses' loss of memory.

*Id.* at 1245-46 (internal citations omitted).

¶36.    Hardy argues that the delay caused the loss of his boat.  Hardy attributes no other prejudice.  This argument seems a bit disingenuous, given that Hardy's attorney alleged the boat was sold before Hardy's first trial setting.  We discern no prejudice.  Therefore, after weighing all of the factors, this issue is without merit.

      **III.**    **Whether the trial court erred in denying Hardy's motion in limine to exclude evidence of alcohol consumption.**

¶37.    "Determining the relevancy and admissibility of evidence is within the discretion of the trial judge, and we will reverse only in the event that discretion has been abused." ***Abrams v. Marlin Firearms Co.***, 838 So. 2d 975, 979 (Miss. 2003).  Hardy argues that the trial court erred in denying Hardy's Motion in Limine to exclude evidence of alcohol consumption.

15

¶38. Under our rules of evidence, "the blood alcohol content of the defendant goes to the state of the defendant's intoxication, and this is relevant and probative on the issue of whether the defendant is guilty of criminally culpable negligence." *Whitehurst v. State*, 540 So. 2d 1319, 1323 (Miss. 1989). "Of course, being intoxicated does not create a prima facie case of culpably negligent manslaughter, but being under the influence is certainly a factor if it can be further established that the intoxication proximately contributed both to the establishment of negligence and to the resulting death." *Id.*

¶39. We find no error in allowing the jury to consider Hardy's impairment. Hardy admitted to drinking six beers prior to the collision. Empty beer cans were found in his boat. A witness saw him with a beer can in his hand as the boat sped in a direct path toward the victims. Westerfield described Hardy as "impaired" and concluded alcohol was as a contributing factor to the collision. Hardy's admission of consumption of alcohol is probative of impairment. While Hardy's blood alcohol content was .09 an hour-and-a-half after crashing into Gibson and Mikael, whether he was impaired at the time of the collision is a jury issue. This Court has long held that such evidence is relevant and highly probative. *Abrams v. Marlin Firearms Co.*, 838 So. 2d 975, 979 (Miss. 2003); *Estate of Hunter v. Gen. Motors Corp.*, 729 So. 2d 1264, 1277 (Miss. 1999). The jury was properly instructed that alcohol consumption in and of itself does not constitute culpable negligence, but taken in conjunction with all other factors, it can. As such, this issue is without merit.

    **IV.**    **Whether the trial court erred in granting the State's motion in limine to exclude the DVD.**

¶40.    Hardy argues that the trial court committed reversible error by granting the State's motion in limine to exclude the DVD of a news telecast.  Hardy asserts that he should have been allowed to demonstrate that the steering mechanism was broken.  Still photos and the officer's testimony confirmed the steering cable was severely damaged and not operative.  The DVD is a tv news report with the reporter describing the scene and collision and interviewing Captain Fulton.  The video shows a severely bent and broken steering cable on Hardy's boat.

¶41.    After extensive argument, the trial judge ruled that Hardy could ask Captain Fulton the "same questions [the reporter] asked him," but could not play the video to the jury due to its extrinsic nature and hearsay statements. The judge ruled that the video could be used to impeach Fulton if he answered differently at trial.  At trial, Fulton's testimony was consistent with his answers on the DVD.  Fulton testified that his "exact words to [the reporter] was there is a possibility there was a steering malfunction." Fulton testified that the steering cable on Brad's boat had a "kink" in it, like a straw.

¶42.    We find no error in the trial court's decision not to allow the DVD into evidence.  "A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence." *Green v. State*, 89 So. 3d 543, 549 (Miss. 2012).  The trial court did not prejudice Hardy's case since Fulton's live testimony did not conflict with the statements made during the interview or the photos of the steering cable.  Therefore, this issue is without merit.

V.    **Whether the trial court erred in denying Hardy's motion for directed verdict due to a defective indictment.**

17

¶43.   "A review of the legal sufficiency of an indictment must be reviewed de novo."

*Young v. State*, 119 So. 3d 309, 313 (Miss. 2013). "An indictment must contain (1) the

essential elements of the crime charged, (2) sufficient facts to fairly inform the defendant of

the charge which he must defend, and (3) sufficient facts to enable him to plead double

jeopardy in the event of a future prosecution for the same offense." *Id.*

¶44.   Hardy argues that the indictments for Counts I and II charged only misdemeanor

offenses and failed to allege any conduct by the defendant or overt act.  Hardy argues that

the indictment in Count III is insufficient because it failed to allege a deadly weapon pursuant

to Section 97-3-7(2)(b).[11] *See* Miss. Code Ann. § 97-3-7(2)(b) (Rev. 2006).

¶45.   We find no error in the indictments. Hardy was indicted for two counts of culpable-

negligence manslaughter pursuant to Section 97-3-47 of the Mississippi Code, and one count

of aggravated assault pursuant to Section 97-3-7(2)(a) of the Mississippi Code.

---

[11]Section 97-3-7 of the Mississippi Code has since been amended. 2014 Miss. Laws WL No. 175 (S.B. 2476).

18

¶46. Counts One[12] and Two[13] of the indictment contain the essential elements of culpable-negligence manslaughter and fairly inform the defendant of the charges. Section 97-3-47 defines manslaughter as "every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter." Miss. Code Ann. § 97-3-47 (Rev. 2006). The indictment contains the name of the accused (Hardy), the date of the incident (May 30, 2010), the county (Rankin), the crime charged (manslaughter) and the signature of the foreman. The indictment also states that Hardy unlawfully killed ("unlawfully and feloniously, kill and slay,") two specific victims, Mikeal Hardy and Roger Gibson, "by culpable negligence . . . by negligent operation of a boat." Thus, the indictment contains the essential elements of felony culpable-negligence manslaughter and fairly informed Hardy of the charges against him to allow him to prepare an adequate defense. *See Young v. State*, 119 So. 3d 309, 313 (Miss. 2013); *Gatlin v. State*, 724 So. 2d 359, 366 (Miss. 1998).

---

[12]Count One is as follows: "Brad Hardy, late of the county aforesaid, on or about the 30th day of May, 2010, in the county aforesaid and within the jurisdiction of this Court did unlawfully and feloniously, kill and slay Mikeal W. Hardy, a human being, by culpable negligence, without authority of law, by the negligent operation of a boat, in violation of Miss. Code Ann. 97-3-47(1972), as amended."

[13]Count Two is as follows: "And based upon a series of acts connected together and constituting parts of a common scheme, and plan, Brad Hardy, late of the county aforesaid, on or about the 30th day of May, 2010, in the county aforesaid and within the jurisdiction of this Court did unlawfully and feloniously, kill and slay Roger P. Gibson, a human being, by culpable negligence, without authority of law, by the negligent operation of a boat, in violation of Miss. Code Ann. 97-3-47(1972), as amended."

¶47.   Likewise, Count Three[14] of the indictment is sufficient. Hardy was indicted on Count Three for aggravated assault pursuant to Section 97-3-7(2)(a). At the time, Section 97-3-7(2) stated "[a] person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life . . . . " Miss. Code Ann. § 97-3-7(2) (Rev. 2006). The indictment stated that Hardy "unlawfully, feloniously, purposely or knowingly attempt[ed] to cause serious bodily injury to William K. Hulett . . . by colliding his boat into . . . Hulett under circumstances manifesting extreme indifference to the value of human life." Thus, like the first two counts, Count Three contains the essential elements of the crime for which Hardy was indicted and fairly informs him of the charge. Section 97-3-7(2)(a) does not require the use of a "deadly weapon" like 97-3-7(2)(b). Thus, Hardy's argument at trial, that a boat is not a deadly weapon, is irrelevant.

¶48.   All three counts state the essential elements of the crimes charged; thus, the trial court did not err by denying Hardy's motion to dismiss.

### VI.   Whether the trial court erred in refusing Jury Instructions D-1, D-2, D-3, D-5, D-6 and D-11.

¶49.   The standard of review for challenges to jury instructions is as follows:

---

[14]Count Three is as follows: "And, based upon a series of acts connected together and constituting parts of a common scheme, and plan, Brad Hardy, late of the county aforesaid, on or about the 30th day of May, 2010, in the county aforesaid and within the jurisdiction of this Court, did unlawfully, feloniously, purposely or knowingly attempt to cause serious bodily injury to William K. Hulett, a human being, by colliding his boat into William K. Hullet under circumstances manifesting extreme indifference to the value of human life, in violation of Mississippi Code Annotated Section 97-3-7(2)(a)(1972), as amended."

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Austin v. State*, 784 So. 2d 186, 192 (Miss. 2001) (citations omitted).

¶50. Hardy argues that the trial court committed reversible error by refusing instructions D-1, D-2, D-3, D-5, D-6, and D-11. Hardy argues that, since the boat was a key piece of evidence, the jury should have received jury instructions D-1,[15] D-2,[16] and D-3,[17] which would have allowed the jury to draw inferences against the State for losing the boat, a legal issue which the court rejected in Hardy's motion to dismiss and for which Hardy failed to sustain his burden. As for D-5,[18] Hardy argues that it is a correct definition of the degree of

---

[15]"The Court instructs the jury that if you find that the State has lost, destroyed, or failed to preserve evidence whose contents or quality are important to the issues in this case, then you should weight the explanation, if any, given for the loss or unavailability of the evidence. If you find that any such explanation is inadequate, then you may draw an inference unfavorable to the State, which in itself may create a reasonable doubt as to the defendant's guilt."

[16]D-2 is identical to D-1 *supra*.

[17]The Court instructs the jury that if you determine by a preponderance of the evidence that State of Mississippi through it's [sic] actions or, inactions caused the boat/evidence to become either destroyed, misplaced, or unavailable then you shall infer that the boat/evidence would be unfavorable to the State, and the jury may give to such evidence whatever weight, worth and credibility the jury determines that said evidence is entitled."

[18]"The Court instructs the jury that culpable negligence is negligence of a higher degree than that which in civil cases is held to be gross negligence, and must be a negligence of a degree so gross as to be tantamount to a wanton disregard or utter indifference to the safety of human life and the conscious and wanton or reckless disregard of the probabilities of fatal consequences to others as a result of a willful creation of an unreasonable risk and that this shall be so clearly evidence as to place it beyond every reasonable doubt."

21

negligence required in a culpable-negligence case. Finally, Hardy argues that D-6[19] and D-11[20] should have been granted in order to properly instruct the jury on how to weigh the presence of alcohol.

¶51. The State counters that there is no evidentiary basis for the spoilation instructions (D-1, 2, and 3) since there was no showing of bad faith or intentional destruction of the boat on behalf of the State. As for D-5, the State asserts that the trial court correctly accepted S-8A instead of D-5.

¶52. We find no error in the trial court's denial of Hardy's proposed instructions. D-1, D-2, and D-3 lack evidentiary foundation for spoilation-of-evidence instructions. *Murray v. State*, 849 So. 2d 1281, 1286-87 (Miss. 2003); see *Johnston v. State*, 618 So. 2d 90, 92 (Miss. 1993) (where "there had been no intentional destruction of the evidence . . . [t]here is therefore no inference that the evidence would have been unfavorable to the State."). Likewise, the trial court properly denied D-5, as S-8A is a proper instruction on culpable-negligence manslaughter and this Court has held that there is no requirement for a jury instruction distinguishing culpable negligence from civil negligence. *Robinson v. Sate*, 571

---

[19]"The Court instructs the jury that one may be negligent while acting lawfully. One may violate the law and yet not be culpably negligent in fact. For driving under the influence of alcohol to be a factor in a case involving culpable negligence it must create an abnormal mental and physical condition which tends to deprive one of the clearness of intellect and control of himself which he would otherwise possess."

[20]"The Court instructs the jury that driving while intoxicated is a crime in and of itself, but does not, by itself, constitute culpable negligence or otherwise make an act of simple negligence into an act of culpable negligence and in order for driving under the influence of alcohol to be a factor involving culpable negligence it must create an abnormal mental and physical condition which tends to deprive one of the clearness of intellect and control of himself which he would otherwise possess."

22

So. 2d 275, 277 (Miss. 1990); *Gebben v. State*, 108 So. 3d 956, 968 (Miss. Ct. App. 2012).

However, this Court has noted that the giving of a comparison instruction "should be encouraged." *Id.* Finally, the trial judge did not err by denying D-6 and D-11, as S-9a, which incorporated D-6 and D-11, is a correct statement of law[21] which properly instructed the jury's consideration of alcohol.

> **VII.    Whether there was sufficient evidence of the elements of culpable-negligence manslaughter to convict Hardy.**

¶53.    The standard of review for the legal sufficiency of the evidence is as follows:

> this Court will reverse and render only if the facts and inferences " 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,' . . . ." The evidence will be deemed sufficient if " 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,' . . . ." The relevant question is whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "
>
> This Court considers the evidence in the light most favorable to the state. The state receives the benefit of all favorable inferences that may reasonably be drawn from the evidence.

*Hughes v. State*, 983 So. 2d 270, 275-76 (Miss. 2008) (internal citations omitted). Hardy argues that the steering-cable malfunction was a intervening superseding cause which absolves him of any criminally negligent behavior.

¶54.    The evidence was sufficient to support Hardy's convictions. Hardy admitted he operated the boat after drinking approximately six beers. Witnesses described him as "impaired." Beyond his admissions, several eyewitnesses testified that Hardy's boat was

---

[21]*Hopson v. State*, 615 So. 2d 576, 578-79 (Miss. 1993).

speeding, and rather than slowing down, Hardy left the throttle in the wide-open position. In short, sufficient uncontradicted evidence demonstrated that Hardy operated the boat in a reckless manner (speeding, failing to reduce speed when approaching a group of persons [adults and children] and operating from a standing position) all while under the influence. Considering the evidence in the light most favorable to the State, we find that reasonable, fair-minded jurors could have found Hardy guilty on all three counts. *Goldman v. State*, 406 So. 2d 816, 819 (Miss. 1981); *cf. Evans v. State*, 562 So. 2d 91, 94-95 (Miss. 1990); *Craig v. State*, 520 So. 2d 487, 488-89 (Miss. 1988). Thus, this issue is without merit.

### VIII. Whether Hardy's right against double jeopardy was violated when he was convicted of both culpable-negligence manslaughter and aggravated boating under the influence.

¶55. "We apply a de novo standard of review to claims of double jeopardy." *Kelly v. State*, 80 So. 3d 802, 804 (Miss. 2012).

> The constitutional protection at issue, commonly known as the double-jeopardy clause, is enforceable against the states through the Fourteenth Amendment. Its protection prohibits, inter alia, multiple punishments for the same offense. . . . a conviction can withstand double-jeopardy analysis only if each offense contains an element not contained in the other. . . . If they do not, the two offenses are, for double-jeopardy purposes, considered the same offense, barring prosecution and punishment for both.

*Boyd v. State*, 977 So. 2d 329, 334 (Miss. 2008) (internal citations omitted).

¶56. Hardy argues that aggravated boating under the influence is a lesser-included offense of culpable-negligence manslaughter. Thus, Hardy argues that double jeopardy prevents him from being convicted and sentenced for the two counts of culpable-negligence manslaughter.

¶57. Hardy's double-jeopardy claim is inapplicable in the case *sub judice*. Double jeopardy does not arise, as Hardy was convicted of aggravated boating under the influence on the William Hulett indictment, not the Mikael Hardy or Roger Gibson manslaughter indictments. In other words, Hardy was not convicted of both manslaughter and aggravated boating under the influence as to the same victim. Hardy's conviction for aggravated boating under the influence required proof of a fact, an act against Hullett, which the elements necessary to convict in the two manslaughter charges did not require. Thus, this issue is without merit.

### IX. Whether the trial court showed bias and/or prejudice to Hardy.

¶58. Hardy directs this Court to two statements from the trial judge over the course of the three-day trial as evidence that the trial judge acted with bias and prejudice. Both statements occurred outside the presence of the jury. Based on a review of the entire trial, we find no evidence of any bias or prejudice on the part of the trial court.

### CONCLUSION

¶59. We find Hardy's issues are without merit. We affirm his conviction and sentence.

¶60. **COUNT I: CONVICTION OF CULPABLE NEGLIGENCE MANSLAUGHTER AND SENTENCE OF EIGHTEEN (18) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF CULPABLE NEGLIGENCE MANSLAUGHTER AND SENTENCE OF EIGHTEEN (18) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF AGGRAVATED BOATING UNDER THE INFLUENCE OF ALCOHOL AS A LESSER INCLUDED OFFENSE OF AGGRAVATED ASSAULT AND SENTENCE OF EIGHT (8) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IMPOSED IN COUNT I SHALL RUN CONSECUTIVELY TO SENTENCE IMPOSED IN COUNT II AND SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY TO SENTENCE IMPOSED IN COUNT III. THE LAST EIGHTEEN (18) YEARS IN COUNT I SHALL**

**BE SUSPENDED AND APPELLANT SHALL BE RELEASED AND SERVE FIVE (5) YEARS ON SUPERVISED PROBATION, WITH CONDITIONS. APPELLANT SHALL RECEIVE CREDIT FOR TIME SERVED IN PRETRIAL DETAINMENT. APPELLANT SHALL PAY COURT COSTS, FEES AND ASSESSMENTS OF $2,431.50, A FINE OF $10,000 IN COUNT I, A FINE OF $10,000 IN COUNT II, AND A FINE OF $10,000 IN COUNT III WITHIN TWO (2) YEARS AFTER RELEASE FROM CUSTODY.**

**WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**